1

**LEVI & KORSINSKY LLP**
NICHOLAS I. PORRITT
2      ADAM M. APTON
1101 30th Street N.W., Suite 115
3      Washington, D.C. 20007
Tel: (202) 524-4290
4      Fax: (202) 333-2121
nporrit@zlk.com
5      aapton@zlk.com

6      *Attorneys for Lead Plaintiff*
*and Lead Counsel for Class*
7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                       **FOR THE DISTRICT OF ARIZONA**

10     Dean Magro, et al.,                    No. CV-16-00186-PHX-DJH

11                           Plaintiff,

12              v.                            **CLASS ACTION**

13     Freeport-McMoran Incorporated, et al.,  **AMENDED COMPLAINT FOR**
**VIOLATION OF THE FEDERAL**
14                           Defendants.       **SECURITIES LAWS**

15                                            **DEMAND FOR JURY TRIAL**

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff Powszechne Towarzystwo Emerytalne PZU Spólka Akcyjna ("Plaintiff"), by and through its counsel, individually and on behalf of all others similarly situated, for its Amended Complaint for Violation of the Federal Securities Laws (the "Complaint") against Defendants, allege the following based upon personal knowledge as to itself and its own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, conversations with potential witnesses, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Freeport-McMoran Inc. ("Freeport" or the "Company"), analysts' reports and advisories about Freeport and information readily obtainable on the Internet.

Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     Plaintiff brings this lawsuit to recover damages it sustained in connection with its purchases of Freeport common stock between February 27, 2015 and January 15, 2016, inclusive (the "Class Period"). Freeport is an international mining company. Unbeknownst to investors at the time, Freeport engaged in a scandalous and illicit lobbying campaign against the Government of Indonesia ("GOI") that violated the Foreign Corrupt Practices Act of 1977, as amended, 15 U.S.C. §§ 78dd-1, *et seq.* (the "FCPA"), as well as Indonesian law and internal corporate anti-bribery and anti-corruption policies. Freeport's objective was to secure extensions and modifications of crucial mining contracts in advance of permissible negotiation time limits and, importantly, before the end of current President Joko "Jokowi" Widodo's first term in 2019. As the news pertaining to Freeport's illegal conduct entered the marketplace, the price of Freeport's common stock declined significantly in value. This resulted in millions of dollars in losses to Plaintiff and other Freeport shareholders.

2.     Freeport conducts its Indonesian operations through a controlled subsidiary named PT Freeport Indonesia ("Freeport Indonesia"). Freeport, through Freeport Indonesia,

1

1    is permitted to conduct operations within Indonesia pursuant to a Contract of Work
2    ("COW") which was executed initially in 1967 and amended in 1991. Freeport's COW is set
3    to expire in 2021, but is subject to two ten-year extensions which could permit Freeport to
4    continue operating within Indonesia until 2041. Significant to this action is the fact that
5    Indonesian regulations prohibited Freeport from negotiating the COW (or the terms of its
6    extensions) prior to two years before the COW's expiration (*i.e.*, Freeport was not allowed to
7    negotiate the terms of its extension prior to 2019).

8        3.    The size and scope of Freeport's Indonesian mining operations made it
9    imperative for the Company to extend of its COW as soon as possible. Freeport's Indonesian
10   mining operations occur within the Grasberg minerals district, which is located in Papau on
11   the western half of New Guinea. Freeport Indonesia has produced between 20% and 30% of
12   the Company's copper and virtually all of its gold for the past four fiscal years. Freeport
13   intends on increasing its operations within the Grasberg minerals district by transitioning its
14   above-ground operations at the Grasberg open pit to below-ground mining. In aggregate,
15   Freeport expects the below-ground ore bodies to process approximately 240,000 metric tons
16   of ore per day following the transition, currently anticipated to occur in late-2017—for
17   comparative purposes, production at the Grasberg open pit totaled 42 million metric tons of
18   ore for the entire fiscal 2015 year. Freeport anticipates capital expenditures to complete the
19   transition of approximately $1 billion per year for at least the next five years. Freeport's
20   "most significant operating asset" was, at all relevant times, the "Grasberg minerals district"
21   in Indonesia.

22       4.    Freeport's statements during the Class Period materially misled Plaintiff and
23   other investors to believe that the Company was abiding by FCPA standards in the course of
24   its negotiations with the GOI, and that these negotiations were yielding positive results.
25   Freeport's efforts to prematurely secure the COW extension began in 2014 when Freeport's
26   Chief Executive Officer, defendant Richard C. Adkerson, and Executive Chairman,
27   defendant James R. Moffett, traveled to Indonesia to meet with high-level GOI officials.
28   When their efforts failed, Freeport hired Maroef Sjamsoeddin ("Sjamsoeddin") to serve as

President of Freeport Indonesia and facilitate back-channel negotiations with the GOI to obtain the COW extension. Sjamsoeddin had a long history of involvement in GOI politics with connections in both the current administration and the primary opposition party.

5.     Over the course of the next several months, Sjamsoeddin engaged in several discussions with high-level GOI officials in an attempt to secure Freeport's critical COW extension before President Jokowi's next election in 2019 and prior to the time allowed under Indonesian regulations. In addition to threatening legal action against the GOI, Sjamsoeddin offered shares of Freeport Indonesia as well as interests in lucrative business opportunities to Setya Novanto ("Novanto"), speaker of the GOI House of Representatives, and other select politicians within the upper echelons of the GOI. At least one of Sjamsoeddin's conversations with Novanto was recorded. This Complaint contains excerpts from that recording which show that Sjamsoeddin attempted to procure the cooperation of the GOI through illegal bribes in violation of the FCPA, Indonesian law, and internal Freeport policies.

6.     Freeport has survived for decades in Indonesia where bribery and corruption are commonplace. First-hand accounts from confidential informants as well as past reports of bribery scandals confirm that Freeport's ability to succeed within Indonesia has, in part, been due to Freeport's willingness to partake in the corruption. Defendants' statements during the Class Period, however, withheld this from investors in addition to the fact that their conduct exposed the Company to serious risks of penalties for violating the FCPA. Defendants' statements also omitted misled investors to falsely believe that Freeport's efforts to obtain the COW extension were succeeding. Defendants' statements during the Class Period should have disclosed the true nature of their operations within Indonesia. They did not, however, and Plaintiff suffered the consequences when the truth emerged.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Act [15 U.S.C. §§78j(b) and 78t(a)], Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5] and Sections 11 and 15 of the Securities Act [15 U.S.C. §§77k and 77o].

3

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 27 of the Act [15 U.S.C. §78aa] and Section 22 of the Securities Act [15 U.S.C. §77v].

9.     Venue is proper in this District pursuant to Section 27 of the Act and 28 U.S.C. §1391(b) and (c). Many of the acts that constitute the alleged violations of law occurred in this District.

10.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE").

11.     This Court has jurisdiction over each Defendant named herein because each Defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

## **PARTIES**

12.     Plaintiff purchased Freeport shares as set forth herein and in its certification filed with the Court in connection with its motion for lead plaintiff (Dkt. No. 21-1). Plaintiff's certification is incorporated herein by reference.

13.     Freeport is a corporation organized and existing under the laws of Delaware. It maintains its principal corporate offices at 333 North Central Avenue, Phoenix, Arizona. Freeport's common stock trades on the NYSE under the ticker symbol "FCX".

14.     Defendant Richard C. Adkerson ("Adkerson") served at all relevant times as the Company's Vice Chairman, Chief Executive Officer ("CEO"), and President. Adkerson served as Vice Chairman of the Board since June 2013, President since January 2008 and also from April 1997 to March 2007, Chief Executive Officer since December 2003 and a director since October 2006. Adkerson previously served as Chief Financial Officer from October 2000 to December 2003. Adkerson also served as Co-Chairman of the Board of

McMoRan Exploration Co. from September 1998 until Freeport's acquisition of McMoRan Exploration Co. in 2013.

15.     Defendant Kathleen L. Quirk ("Quirk") served at all relevant times as the Company's Chief Financial Officer, Executive Vice President, and Treasurer. Quirk has served as Executive Vice President since March 2007, Chief Financial Officer since December 2003 and Treasurer since February 2000. Quirk previously served as Senior Vice President from December 2003 to March 2007. Quirk served as the Senior Vice President of McMoRan Exploration Co. from April 2002 and as Treasurer from January 2000 until Freeport's acquisition of McMoRan Exploration Co. in 2013.

16.     Defendant C. Donald Whitmire, Jr. ("Whitmire") served at all relevant times as the Company's Vice President and Controller, Financial Reporting, and Principal Accounting Officer.

17.     Defendant James R. Moffett ("Moffett," also known as "Jim Bob") served as Chairman of the Board from May 1992 until his resignation on or about December 28, 2016. Moffett previously served as the Chief Executive Officer from July 1995 until December 2003. He served as Co-Chairman of the Board of McMoRan Exploration Co. from September 1998, and President and Chief Executive Officer from May 2010 until Freeport's acquisition of McMoRan Exploration Co. in 2013.

18.     Adkerson, Quirk, Whitmire, and Moffett are collectively referred to herein as the "Individual Defendants."

19.     Freeport and the Individual Defendants are collectively referred to herein as "Defendants."

20.     Non-party Freeport Indonesia is a limited liability company organized under the laws of the Republic of Indonesia. Freeport directly own 81.28 percent of the outstanding common stock of Freeport Indonesia and indirectly own 9.36 percent through Freeport's wholly owned subsidiary, PT Indocopper Investama; the Indonesian government owns the remaining 9.36 percent.

**SUBSTANTIVE ALLEGATIONS**

A.    **Sources Confirm that Freeport has been Violating the FCPA for Many Years**

21.    The FCPA was enacted for the purpose of making it unlawful for certain classes of persons and entities to make payments to foreign government officials to assist in obtaining or retaining business. In November 2012, the Criminal Division of the U.S. Department of Justice and the Enforcement Division of the SEC published *A Resource Guide to the U.S. Foreign Corrupt Practices Act*, which elaborated on the purpose of the FCPA:

> Corruption is anti-competitive, leading to distorted prices and disadvantaging honest businesses that do not pay bribes. It increases the cost of doing business globally and inflates the cost of government contracts in developing countries. Corruption also introduces significant uncertainty into business transactions: Contracts secured through bribery may be legally unenforceable, and paying bribes on one contract often results in corrupt officials making ever-increasing demands. Bribery has destructive effects within a business as well, undermining employee confidence in a company's management and fostering a permissive atmosphere for other kinds of corporate misconduct, such as employee self-dealing, embezzlement, financial fraud, and anti-competitive behavior. Bribery thus raises the risks of doing business, putting a company's bottom line and reputation in jeopardy. Companies that pay bribes to win business ultimately undermine their own long-term interests and the best interests of their investors.

22.    The anti-bribery provisions of the FCPA prohibit the willful use of the mails or any means of instrumentality of interstate commerce corruptly in furtherance of any offer, payment, promise to pay, or authorization of the payment of money or anything of value to any person, while knowing that all or a portion of such money or thing of value will be offered, given or promised, directly or indirectly, to a foreign official to influence the foreign official in his or her official capacity, induce the foreign official to do or omit to do an act in violation of his or her lawful duty, or to secure any improper advantage in order to assist in obtaining or retaining business for or with, or directing business to, any person.

23.    The FCPA is interpreted expansively to achieve its purpose. The definitions of "payment" and "foreign official" are sufficiently broad to cover virtually any benefit conferred on someone in a position to affect a person's business dealings with a foreign

government. Nonmonetary benefits, including travel and entertainment, fall within the statute, and there is no monetary threshold. Thus, even the smallest bribes constitute of violation. And a bribe need not actually be paid; rather, the FCPA prohibits the offer, authorization, or promise to make a corrupt payment in addition to the actual payment. Further, the U.S. Department of Justice's position is that employees of state-owned business enterprises are "foreign officials" for purposes of the FCPA.

24.     The FCPA prohibits payments made with a "corrupt" motive, which the legislative history describes as an "evil motive or purpose, an intent to wrongfully influence the recipient." To constitute a violation, the payment, offer authorization, or promise must be intended to cause an official to take an action or make a decision that would benefit the payor's business interest. The business to be "obtain[ed] or retain[ed]" by the corrupt payment need not be with the government or a government-owned entity. The FCPA is violated if a corrupt payment is made to improperly facilitate the obtaining or retaining of business with a third party.

25.     The FCPA's bribery prohibition contains a narrow exception for "facilitating or expediting payments" made in furtherance of routine governmental action. But routine government action does not include a decision to award new business or to continue business with a particular party. The FCPA applies broadly to bribes paid to help obtain or retain business, which can include payments made to secure a wide variety of unfair business advantages.

26.     The accounting provisions of the FCPA require issuers to make and keep accurate books and records and to devise and maintain an adequate system of internal accounting controls. A company's internal controls must take into account the degree to which it has operations in countries with a high risk of corruption. The accounting provisions also prohibit individuals and businesses from knowingly falsifying books and records or knowingly circumventing or failing to implement a system of internal controls.

27.     Freeport proclaimed to comply with the FCPA. The Company's "Principles of Business Conduct" contained a section titled "Fighting Corruption and Bribery." Within this

section, Freeport stated that "[w]e abide by all international and local laws and regulations that forbid bribery of foreign officials and others, including the U.S. Foreign Corrupt Practices Act." Freeport's policy stated further that, "We do not offer or pay bribes, kickbacks, illegal gratuities or other similar payments to any person, organization or government official to secure improper advantages for our business. Likewise, we will not accept any bribe, kickback, illegal gratuity or similar payment. In addition, no payments, transfers or offers of Company funds, assets or anything of value shall be made that are not consistent with our policies and applicable laws, properly authorized according to our internal procedures, properly accounted for and clearly and accurately identified on the Company's books."

28.    Freeport also "adopted a comprehensive anti-corruption compliance program, which include[d] detailed policies and procedures regarding authorizations and recordkeeping for specific categories of transactions, including travel expenses, charitable contributions, gifts and entertainment, and other payments to foreign governments and government officials." This policy, referred to by Freeport as its "Anti-Corruption Policy," set out thorough instructions and restrictions concerning FCPA compliance.

29.    The Anti-Corruption Policy explained the basic tenets of the FCPA. It also identified possible conduct that could be seen as a violation of the FCPA. In particular, Freeport's Anti-Corruption Policy stated that, "The FCPA's anti-bribery provisions make it illegal to bribe Government Officials to obtain or retain business or an improper advantage. Specifically, the FCPA prohibits making, offering, promising or authorizing any gift, payment or other thing of value, with corrupt intent, to a Government Official. The FCPA does not make an exception for cases where an official requests or solicits an improper payment."

30.    Freeport's rules and policies concerning FCPA compliance applied to all Company personnel and affiliates, including the Individual Defendants and the officers and agents of Freeport Indonesia. According to the Company's Anti-Corruption Policy, "[e]veryone—employee, agent and other business partner—whose duties are likely to lead to

8

involvement in or exposure to any of the areas covered by the FCPA and other applicable anticorruption laws is expected to become familiar with and comply with this Policy and the Anti-Corruption Compliance Guidelines, as well as local policies and procedures. Periodic certifications of compliance will be required, as will participation in training sessions from time to time." Furthermore, according to Freeport's Principles of Business Conduct, "[s]elect employees (including certain managers, supervisors and other personnel) are required to certify their understanding of and compliance with the Principles of Business Conduct on an annual basis. Managers and supervisors are additionally responsible for ensuring that the employees who report to them understand these Principles and all applicable policies, procedures and laws."

31.     Notwithstanding Freeport's supposed strict compliance with the FCPA and its other anti-corruption policies, sources indicate that the Company and Freeport Indonesia have been making illegal payments to the GOI and local officials for many years. For example, beginning with the revised COW in 1991, Freeport executed the agreement shortly after the Company sold a 10% stake in the mine to the politically-connected Bakrie family for $213 million, of which $173 million was financed by Freeport. A year later the Bakries sold half of the shares back to Freeport for $212 million, effectively giving them a free 5% stake that they sold in 1996 at a substantial profit. Aburizal Bakrie is the former Chairman of Indonesia's Golkar party, which ruled under former President Muhammad Suharto.

32.     In March 1996, in response to severe riots within the Grasberg minerals district, Moffett met with a group of senior Indonesian military officers at the Sheraton Hotel in Timika, which is near the mine. At the meeting, General Prabowo Subianto, son-in-law of President Suharto and commander of the Indonesian Special Forces, told Moffett that he would "have to help the military" in order for them to protect Freeport. According to the *New York Times* article that reported the story based on first-hand witness accounts, Moffett replied: "Just tell me what I need to do." Each military service provided Moffett with its demands and, as a result, Freeport ultimately spent $35 million on military infrastructure,

including barracks, headquarters, mess halls, and roads. Freeport also purchased 70 Land Rovers and Land Cruisers, which were replaced every few years, for military commanders.

33.    Freeport's payments to the military increased over the years. According to the *New York Times* as well as several other reports (including an expose by Global Witness Publishing Inc.), Freeport began making monthly payments to Indonesian military commanders and local police. Between 1998 and 2004, Freeport gave the military and the police in Papua at least $30 million. This amount of money included payments to individual military officers for "food," "administrative services," and "monthly supplements." Some of these payments were extremely large—for example, Lt. Col. Togap F. Gultom received $100,000 for "food" in 2001 and $150,000 the following year. At least 10 other commanders received a total of $350,000, also supposedly for "food."

34.    Freeport's payments to the military also included commercial airplane tickets for themselves and their families. General Ramizan Tarigan received $14,000 worth of tickets in 2002 for himself and his family. In 2002, Freeport provided Major General Mahidin Simbolon of Papua more than $64,000 for "fund[ing] for military project plan 2002." Global Witness Publishing reported that Simbolon actually received far more than $64,000 from Freeport. Between 2001 and 2003, Simbolon purportedly received almost $250,000.

35.    Freeport's FCPA violations extend beyond the Indonesian military. According to a former employee who worked at Copper Overseas Services Company, which is 100% owned by Freeport Indonesia and serves as Freeport's arm in terms of managing overseas employees, from March 2009 to April 2010 in Indonesia, the Company engaged in dozens of improper agreements with Indonesian entities and members of the GOI and/or their relatives. This former employee—referred to herein as "FE1"—served as a Manager of Contract Agreement and Compliance who was responsible for managing and renegotiating contracts between Freeport and various Indonesian contractors. During FE1's tenure, FE1 oversaw approximately 1,400 contacts covering $2.8 billion in annual spending. FE1 reported to

1  Robert Schroeder, Freeport Indonesia's current Senior Vice President Director of Corporate

2  Planning and Cost Control.

3      36.    FE1 recalled finding a certain number of contracts (approximately 30-40) from

4  Freeport Indonesia's Legal Department during his tenure at Freeport which, in FE1's opinion

5  were "suspect." FE1 described these contacts as "under-the-table" (or UTT) contracts which

6  served as channels through which Freeport made illicit payments to various government

7  agencies within Indonesia. These UTT contracts were listed in a Microsoft Excel

8  Spreadsheet. The UTT contracts on the Microsoft Excel Spreadsheet were never listed on

9  any official or formal contract list. The UTT contracts provided for services such as

10 translation services, analyzing core samples, pollution clean-up, environmental certifications,

11 etc. The UTT contracts would allow for "evergreen" renewal (which mean that the contracts

12 continued for unlimited terms automatically), no open bidding, and significant above-

13 market-rate payment. Further, the UTT contracts were with companies and/or entities either

14 owned or operated by national or local governmental officials or close family members of

15 these governmental officials.

16     37.    Freeport's UTT contracts included, for example, the following:

17 • Freeport paid a contract to a Papuan tribe to maintain a fence around a
18   particular property containing a hotel near an airport. The fence was
19   intended to keep Papuan people out of the area and to prevent them from
     planting illegal gardens. FE1 said that the fence contract was over-priced
20   and renewed automatically. FE1 went to look at the fence during his
     tenure at the Company and came to find out that the fence had not been
21   there in roughly 5 years. According to FE1, the fence contract was a
     means by which Freeport simply paid local Papuans to allow Freeport to
22   use the land without interference.

23 • Freeport paid a contract for sewage waste disposal for portable outhouses
24   at the Grasberg mining site. FE1 recalled that the contract provided for
25   $100,000/year instead of market rate of about $1,000/month.

26 • Freeport maintained its own mosque. Freeport paid for restoration
27   projects that were never completed and were in perpetual construction.

28

- Freeport assisted one local tribe chief by installing his daughter as a local travel agent. The daughter accumulated significant debt, which Freeport agreed to pay. Freeport then hired the daughter to work at Freeport Indonesia to do payroll.

- Freeport needed to have power plant emissions certified for environmental compliance. Freeport hired a company to do the testing that was owned by a family member of a minister within the GOI.

38.     FE1 cited a number of other examples of UTT contracts. These contracts involved housing fees for Indonesia's immigration department, payments to customs agents, and payments to labor companies. According to FE1, Freeport's UTT payments were "endemic" at the Company. To this end, the Company had a special payment system for its UTT contracts. This payment system, according to FE1, was referred to as "NOI" or "not on an invoice." Whereas Freeport normally implemented a two-way match verification system for payments (*i.e.*, accounting would need to verify the payment amount on both the purchase order and invoice), the NOI system did not have such controls. Instead, NOI payments did not have to match with anything—an invoice was all that was needed for payment from Freeport Indonesia for these UTT contracts. FE1 recalled once being told by Bill Harris, Schroeder's predecessor, during an in-person meeting that "in doing what's right for the contracts department, never do anything to jeopardize or interfere with line production or operations." Harris' intended point was that that FE1 should permit and facilitate Freeport's UTT contracts without hesitation.

39.     Freeport was aware that its UTT contracts were improper. Accenture provided contract risk exposure analysis to Freeport Indonesia on an annual basis. When Accenture came to do the audit during FE1's tenure, FE1 recalled being told by Robert Schroder and Daniel Hughes (Freeport Indonesia's former Chief Financial Officer) not to provide full access to Accenture and to not cooperate with Accenture. Schroder and Hughes would hand select which contracts to provide to Accenture. According to FE1, these directives came from Adkerson who was aware at all times of how Hughes was managing Freeport Indonesia.

1    40.    Towards the end of 2009, FE1 was asked during an internal audit whether they
2  were aware of any improprieties at the Company or conduct that violated the Company's
3  rules. FE1 responded affirmatively. Specifically, FE1 reported two improper contracts
4  with—the first was a contract that appeared to be paying money to an Indonesian company
5  for a housing study without receiving the stated deliverables of benefits as stated in the
6  contract. Accordingly, money was paid for a housing study, but no housing study was ever
7  provided and Freeport Indonesia executives who were subject to the ultimate authority of
8  Freeport were wanting to renew the contract and make another payment; and the second
9  improper contract involved payment to an Indonesian government owned company that was
10 paid to issue pollution certificates out of the Indonesian ministry of environment when no
11 such certificates were required by law and the proposed change in processing of waste oil
12 would actually increase the cost of operations. According to FE1, no legitimate reason
13 existed for entering the contract. The two companies involved were BPPT and Indomas
14 Mulia. FE1's report prompted a series of meetings with Freeport's auditor, Deloitte, and
15 Senior Compliance Officer, Dean Falghoust. Approximately two months after FE1 reported
16 the misconduct, Freeport terminated FE1's employment.

17    41.    Additional sources confirm similar behavior on the part of Freeport. For
18 example, a second former employee recalled several instances where Freeport Indonesia
19 engaged in conduct considered bribery or corruption. This former employee—referred to as
20 "FE2"—worked for Freeport Indonesia for over 18 years in Indonesia ending in 2009. FE2
21 was a senior employee responsible for finance, legal, tax, accounting, and security
22 contracting matters. FE2 worked closely with Defendant Moffett during his tenure.

23    42.    FE2 recalled that Defendant Moffett orchestrated Freeport Indonesia's initial
24 divestment of shares. Moffett sold 10% of Freeport Indonesia's shares to former
25 Coordinating Minister for Economic Affairs, Aburizal Bakrie, at a time when share prices
26 were down and at a slightly below market price. Not too long after that, Bakrie sold 50% of
27 the shares back to Freeport Indonesia at a higher market share price than was in effect at the

28

1  time at a sizable profit. Further, Bakrie's purchase was financed in part by Freeport
2  Indonesia.

3      43.    Another example of Moffett's willingness to engage in illegal conduct was
4  when Moffett instructed Freeport Indonesia's accountants to pay double the normal royalty
5  assessment for Indonesia in exchange for an approval from the GOI's Environmental
6  Assessment.

7      44.    An additional example of Freeport's illegal conduct involved Defendant
8  Adkerson. In 2008, the Secretary General for the Minister of Environment approached
9  Freeport Indonesia asking for a cash payment to approve a pending environmental license.
10 The negotiations ended with Michael Arnold, Freeport Indonesia's former Chief Financial
11 Officer, arranging the payout via a contract for removal of ash. The accounting team
12 received a request from Michael Arnold who was directed by Adkerson to make the payment
13 to the Minister of Environment. FE2 recalled that the management team from the United
14 States did not want to know how the payment was paid. Smaller payments were typically
15 given to GOI officials in the past by gifting golf clubs as prizes to them at invitational golf
16 tournaments.

17 **B.**    **Freeport's COW Is Vulnerable to the Precarious Nature of Indonesian Politics**

18     45.    Freeport Indonesia's initial COW was entered into in 1967, and then replaced
19 by the current COW in 1991. The initial term of the current COW expires in 2021, but can be
20 extended for two 10-year periods subject to approval from the GOI. Freeport's COW allows
21 the Company to "conduct exploration, mining and production activities in the 24,700-acre
22 Block A area, which is where all of [Freeport Indonesia's] proven and probable mineral
23 reserves and all its current mining operations are located. Under the COW, Freeport
24 Indonesia also conducts exploration activities in the Block B area currently covering 502,000
25 acres." The COW provides that the GOI will not "nationalize or expropriate [Freeport
26 Indonesia's] mining operations." In exchange for the GOI's permission, Freeport
27 compensates the GOI through royalties and divestments of shares in Freeport Indonesia.

28

14

46.     The GOI has recently adopted laws and regulations that have modified or conflicted with Freeport's rights under the COW. For example, in 2009, the GOI adopted mining laws and regulations which have led Freeport to revise aspects of the COW relating to contract concessions, government revenues, domestic processing of minerals, divestment, provision of local goods and services, conversion from a COW to a licensing framework for extension periods, and a requirement that extensions may be applied for only within two years prior to a COW's expiration. Regulations published in January 2014 imposed, among other things, a progressive export duty on copper concentrate and restricts concentrate exports after January 12, 2017.

47.     In July 2014, Freeport Indonesia entered into a Memorandum of Understanding (the "MOU") with the GOI whereby, among other things, Freeport Indonesia provided the GOI with an assurance bond in support of its commitment for smelter development, agreed to increase royalty rates, and agreed to pay export duties. The MOU also anticipated an amendment of the COW within six months to address other matters; however, no terms of the COW other than those relating to the smelter bond, increased royalties, and export duties were changed. In January 2015, the MOU was extended to July 25, 2015, and it expired on that date. Upon completion of an amended COW, Freeport agreed to divest to the Indonesian national or local governments and/or Indonesian nationals up to a 30 percent interest (an additional 20.64 percent) in Freeport Indonesia at fair market value.

48.     Although the COW grants Freeport with the right to operate in Indonesia in accordance with the COW, government agencies and various political factions have sought revoke and/or interfere with Freeport's Indonesian operations. According to Freeport, Indonesia has long faced separatist movements and civil and religious strife in a number of provinces. Several separatist groups have sought increased political independence for the province of Papua, where the Company's Grasberg minerals district is located. In Papua, there have been sporadic attacks on civilians by separatists and sporadic but highly publicized conflicts between separatists and the Indonesian military.

49.     Moreover, certain government officials and others in Indonesia have questioned the validity of contracts entered into by the Indonesian government prior to May 1998 (*i.e.*, during the Suharto dictator regime, which lasted over 30 years), including Freeport's COW. For years, to secure Freeport's domain, Moffett bribed, compensated, and courted President Suharto and his cronies, including having Freeport pay for vacations, pay for the education of their families, and involve them in lucrative business deals. Current government officials are now demanding renegotiation of the COW (as well as all foreign mining contracts) so that the modified contracts would require, among other things, foreign companies to divest control of the mines to the GOI.

**C.     Freeport's Efforts to Secure Contract Extension Prematurely**

50.     Freeport's Indonesian operation and, in particular, the Grasberg minerals district, is Freeport's "most significant operating asset," according to the Company. The Grasberg minerals district is the largest gold mine and one of the largest copper mines in the world. With virtually all of its global gold production coming from Indonesian mines— containing reserves estimated to be worth at least $40 billion—Freeport's ability to secure an extension of the COW was of paramount importance, especially considering the capital outlay necessary to successfully transition operations to underground mining.

51.     Numerous Freeport employees and representatives have attempted to secure the COW extension. Defendant Adkerson, for example, traveled to Jakarta twice in the span of six months in 2014. In his first visit, which occurred in January, Adkerson met with four ministers in two days to discuss Freeport's operations within Indonesia. The ministers were Hatta Rajasa (Minister of Economy Affairs), Chatib Basri (Minister of Finance), Mohamad Suleman Hidayat (Minister of Industry), and Jero Wacik (Minister of Energy & Mineral Resources). During his second visit, which occurred in June, Adkerson met with the Minister of Economy Affairs, Chairul Tanjung, to discuss the renegotiation of Freeport's COW with the GOI. Minister Tanjung emphasized that Indonesian regulation prohibited the GOI from extending or negotiating Freeport's GOI at any point prior to two years before the COW's expiration.

52.     In addition, Defendant Moffett traveled to Indonesia on several occasions to meet with the former Minister for Political, Legal and Security Affairs, Luhut Pandjaitan. During these meetings, which upon information and belief took place in 2014 and 2015, Moffett requested assistance with regard to extending Freeport's COW. According to an interview by *Tempo* magazine, Moffett visited Pandjaitan at the Bina Graha (presidential building) while Pandjaitan was serving on the Presidential Working Unit (similar to the Chief of Staff). Another time, Moffett brought the U.S. Ambassador to Indonesia, Robert O. Blake, to Pandjaitan's residence. During each of these meetings, Pandjaitan was persistent that he would not extend Freeport's COW prematurely in violation of Indonesian regulation.

53.     Freeport next sought lobbying assistance from a retired member of the Indonesian national intelligence agency with strong political collections, Sjamsoeddin, whom Freeport hired as President of Freeport Indonesia. Sjamsoeddin was recommended to Defendant Moffett by Bob Hassan, one of former President Suharto's close associates and former Minister of Trade and Industry. Sjamsoeddin is a former commander of the Indonesian Air Force Special Operations Forces. Additionally, Sjamsoeddin's older brother is Syafei Sjamsoeddin, a retired 3-star Army General under former President Susilo Bambang Yudhoyono (2004-2014). President Yudhoyono's vice president was Jusuf Kalla, the current Vice President of Indonesia. These connections to the GOI's political elite are in large part why Sjamsoeddin was hired as Freeport Indonesia's President. Sjamsoeddin's connections made him well-suited to aid Freeport in navigating through Indonesia's politico-business environment and negotiate the critical COW extension.

54.     Standard procedure requires foreign mining companies to negotiate contracts and agreements with the GOI's Ministry of Energy and Minerals Resources. Freeport and Sjamsoeddin, however, did not follow standard procedure. Instead, through Sjamsoeddin, Freeport attempted to negotiate the extension of the COW with GOI House of Representatives Speaker Setya Novanto. Novanto is Chairman of the Golkar Party within Indonesia, formerly the largest opposition party to the current administration.

55.     Sjamsoeddin's efforts to secure the extension failed, but not for lack of trying. According to an article from the *Jakarta Post*, Sjamsoeddin attempted to secure the extension through at least three in-person meetings with Novanto. Each of these meetings was in violation of the GOI regulation prohibiting negotiations prior to two years before contract expiration. Further, each of these meetings were in violation of the FCPA and Freeport's anti-bribery and anti-corruption policies. Novanto detailed the chronology of the three meetings for the *Jakarta Post* in an interview:

> He said his first meeting with Freeport president director Maroef Sjamsoeddin took place in his office on the third floor of the House complex in Senayan, Central Jakarta, at around 2 p.m. on April 27. Maroef met him, he said, and asked him to help extend Freeport's mining contract until 2041.
>
> According to the Golkar Party politician, Freeport had agreed to build a smelter in return for the contract being extended. The smelter, Freeport reportedly said, would not be built in Papua but in Gresik, East Java, and preparations for it were nearly complete. If the contract was not extended, claimed Setya, Maroef threatened international arbitration against Indonesia in July 2016.
>
> Soon after the meeting, Setya reported the discussion, including Freeport's extension demand, to President Joko 'Jokowi' Widodo. However, Setya said, the President firmly said that the government would not discuss Freeport's contract extension before 2019, two years before the miner's current contract expired, in 2021.
>
> 'The President firmly said that any Freeport-related measures the government took had to be in line with the law and in the interests of the Indonesian people, especially the Papuans,' said Setya as quoted by kompas.com on Thursday.
>
> After receiving the President's explanation, Setya and Maroef met for the second time in a hotel in Jakarta at 5 p.m. on May 13. Setya said that as he was concerned about the pressure Maroef was applying, especially his threat of legal action, so he decided to invite a businessman along, namely Riza Chalid.
>
> In the meeting, Setya said he conveyed the President's position of not extending the contract before 2019. Acting on Jokowi's explanation, Setya also told Maroef that Freeport's mining contract would have to be revised to deliver greater benefits to the Indonesian people, especially Papuans.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

'I have never misused the names of the President and the Vice President. They are both state symbols that we must protect and pay respect to,' he said.

Setya said Maroef could not accept the explanation and instead reasserted his threat of legal action.

Unsatisfied, Maroef requested a third meeting with Setya. At 4 p.m. on June 8, they met again at the same hotel with Riza again in attendance.

Setya claimed that in that meeting Maroef tried persistently to get him to help expedite the renegotiation of the Freeport's contract extension.

'We were still discussing the international arbitration matter. We thought this was something we needed to resolve [and] that's why I agreed to meet with him again,' said Setya.

Setya said it was in the pair's third and final meeting that his conversation with the Freeport executive was secretly recorded. Energy and Mineral Resources Minister Sudirman Said then used the audio file as evidence when reporting him to the House ethics council. In Sudirman's report, Setya and Riza were accused of asking for Freeport shares and falsely suggesting that Jokowi and Kalla were aware of the move.

Setya has rejected Sudirman's accusations but admitted that there was talk about shares in the third meeting. However, Setya said, the shares spoken of related only to Freeport's share divestment being managed by the Finance Ministry. He also said the audio files and their transcripts, which went viral on social media, were incomplete.

Separately, Freeport spokesperson Riza Pratama said as quoted by kompas.com that as the Indonesian government's contractor, Freeport had adhered to existing rules and regulations. As the subsidiary of US-based Freeport McMoran, he continued, Freeport had also adhered to the US Foreign Corrupt Practice Act. Based on that evidence, Riza claimed it was unlikely that Freeport would act illegal by distributing share allotments to Indonesian officials to expedite the company's contract extension process.

56.     The transcript of the meeting between Novanto, Sjamsoeddin, and Chalid on June 8, 2015 confirms that Sjamsoeddin attempted improperly to obtain the extension of Freeport's COW. Sjamsoeddin's conduct violated Indonesian regulations prohibiting the negotiation of the COW prior to 2019 as well as the FCPA. The following excerpts of the

19

transcript from the conversation on June 8, 2015 (translated into English) demonstrate Freeport's efforts to engage in improper and illegal negotiations in violation of the law:

> <NOVANTO>: . . . I have met with Freeport, Jim Bob, with the President Director. I asked for their consideration. At that time with the minister, talking about the extension, the Parliament asked for discussion. Now there are three matters to consider. Yesterday, Minister of Energy & Mineral Resources met me in Surabaya, just to talk about this. He said there are three things. First is to increase the revenue. Second is privatization, 30 million for 51%. Obviously, I can't say that. Third is smelter factory. All I could say was "Yes. Sir. I don't agree if we stop the revenue. We only receive 7-8 trillion so far, but we disburse at least 35 trillion for special autonomy in Papua. That's not fair." He said, "That's aided by CSR too."  I answered, "Yes but that's just not enough, Sir. We've spent a lot."
>
> Now the second, the smelter. I told him it is mostly swamp areas there. I worry about the time needed to build smelter. I see there is a small smelter in Gresik, we can just continue to use it. Also, there is a cement factory and fertilizer factory too. The most important thing is to use own fund, not through banking fund. "We need to force them to quickly build it."  Okay then. "After that, let's talk about Timika, Sir. Which one first, Sir?"  He did not say anything, just remained silent. I asked him, "What's the third?"  He said about shares portion. We have 30% already but now we ask for 51%. I said, "That's impossible. We have distributed it with the region, about the 250 thousand hectare land. It's difficult. We can imagine what will happen with the other regencies. This is just impossible, Sir."  Again, he did not say further. Mr. Luhut only said let's discuss this. When I was having my meal, Mr. President came to me, "This Mr. Luhut, have you talked with him?" I said, "Yes, I have Sir. Mr. Luhut gave me a lot of inputs. It's better if we can make it as soon as possible. The discussion. Now Sir, because now is the time."
>
> . . .
>
> <CHALID>: Here is the thing, this is from Mr. Luhut and his team. Have you read it?
>
> <SJAMSOEDDIN>: I have read the Presidential Regulation about Acceleration of Economy Growth in Papua.
>
> <CHALID>: So, they want to build it first there. Do they have the concept on site?  From the Minister.
>
> <SJAMSOEDDIN>: Oh, that's not the case.

<CHALID>: So it remains in Gresik.

<SJAMSOEDDIN>: No, that's not what the Law says. The Implementing Regulation (PP) does not says that either. So smelter must be built within the country. PP says that, it says the smelter must be 100% done domestically. Then on January 23, 2015, half month ago, has to fulfill requirements for extension of export permit. One of the six is to decide where the exact location is. One more, about feasibility study. The answer is Gresik. No one says it must be in Papua. After we announced in Gresik and signed on January 23, then Papua Regional Administration announced it must be built in Papua.

<NOVANTO>: And then the President promised so.

<SJAMSOEDDIN>: Exactly. President had a visit there, and promised them to build it. Who will finance it if we build it in Papua. In Gresik alone, it's already 2.3 billion. In Papua, it may take 4 billion.  Where could we find the funding from?  It's just not possible to have it there in Papua.

<CHALID>: Yes, yes. So here it is, I'll talk about that matter with Darmo. I say Darmo is ready, OK. He is the one handling everything. He'll see this, and the cost might be really big.

<NOVANTO>: Also a businessman?

<CHALID>: It's your job to secure everything. So, I have talked to Jokowi. I'm the one handling him.

<CHALID>: About the shares, there is this discourse, hydro power plant (PLTA).

<SJAMSOEDDIN>: PLTA?  Who's going to own the shares?

<CHALID>: There is the nominee, Luhut's.

<SJAMSOEDDIN>: Mr. Luhut.

<CHALID>: It's what Luhut wants, the shares, saying the shares is a compulsory guarantee from Freeport. Just what has Freeport done before to the businessmen. Luhut had talked with Jim Bob in America.

<CHALID>: So if that could be arranged, this secret is only for the four of us to know. Arranged…

<SJAMSOEDDIN>: Sir, we need to calculate it now. Only 6 weeks left. From all six issues I have told the Chairman, we only have 6 weeks from

now. If it is not issued, let's say on upcoming July 23, no certainty on July 1, then we'll go to the International Arbitration.

&lt;CHALID&gt;: What?

&lt;SJAMSOEDDIN&gt;: We'll take International Arbitration. No more excuses. A decision would have to be made on July 1. Now, what is the guarantee when the request is met?  This has to be announced too. What would the guarantee be when, let's say there's signal on July 1?  Don't you think so, Sir?  What is the guarantee?

. . .

&lt;CHALID&gt;: True. The pricing is fair, not too high but not too low either. You own the PT, Sir, for 51%. It's better for you not to give pressure to Freeport's main business, mining.

&lt;SJAMSOEDDIN&gt;: That's the key, the extension letter. It's impossible to have purchasing guarantee when there is no extension. The PLTA going to be built is for underground mining. Underground mining is confirmed when there is extension.

&lt;CHALID&gt;: Correct, extension. We need that commitment. No commitment, no off take guarantee.

&lt;SJAMSOEDDIN&gt;: Wait, talk about commitment, Freeport is committed. Once there is extension, we'll carry on the commitment. I bet on it.

&lt;CHALID&gt;: That's right, commitment.

&lt;SJAMSOEDDIN&gt;: It's just not possible. Freeport has invested USD 4 billion to prepare the underground, infrastructure and operations, although with no certainty. So, don't worry about commitment. As for the smelter, we'll put another USD 700 thousand in December, that's commitment fee. That's December. Still no certainty, Sir.  If we are not aware of it, we are considered non-committed.

&lt;CHALID&gt;: 700 million, Sir?

&lt;SJAMSOEDDIN&gt;: Sorry, yes USD 700 million. We only need commitment. No need for more commitment. It's committed already. No, no…

&lt;CHALID&gt;: But will you take the concept as we talked about earlier, Sir?

&lt;SJAMSOEDDIN&gt;: I can't promise you anything. But just give it first, Sir.

<CHALID>: Well, if it's USD 700 million, I let go this proposal.

<SJAMSOEDDIN>: Which means when there is opportunity… it's all at Mr. Luhut, Sir.

<SJAMSOEDDIN>: Better for you to sign first, Sir.

<NOVANTO>: The signing will follow shortly.

<SJAMSOEDDIN>: From Mr. Chairman's explanation, it's not really clear. From Jokowi, it's not clear.

<NOVANTO>: Basically, Jokowi agrees for Gresik. Next, Papua. But later when I was having my meal, "Mr. Chairman has talked with Luhut?"  I was asked to meet with Luhut. Talk about it. I know this story directly from the meeting between the Dept. of Mineral & Energy Resources and Darmo. To my understanding, Mr. President seems to be, my apology, thinking of something for the future. Because he heard about Mr. Jusuf Kalla. That's why it's always sneered that how come it's Jusuf Kalla all the time. I think he feels there is this…

<SJAMSOEDDIN>: There is obstacle

<NOVANTO>: There is obstacle. That's why we need to cover it up. Every time.

<SJAMSOEDDIN>: To beautify.

<NOVANTO>: Beautify. But from our experiences, meaning me and Luhut, the experiences with Presidents, it's almost 99% successful. Important decisions, like the one in Arab, that's us being involved in it. That's why I know. That's why Riza when he knows Darmo, he maintains him, provides him with large amount of funding, to get him to us. He's clever.

<SJAMSOEDDIN>: Well…the lobbyists

[Laughter]

<NOVANTO>: That's it.

<CHALID>: Sir, Luhut is really close with Mr. Jokowi. If, to give sign he will issue, give sign, he might do this...and this.., it's confidential. Do you understand?  Now, if I say it's confirmed but then it turns out differently, then I'm done.

<SJAMSOEDDIN>: No, no. If commitment is announced, it won't slip. Like percentage of shares.

<CHALID>: That's still uncertain.

< SJAMSOEDDIN >: You have to get a clear statement on the percentage of shares. That's not small money and value of Freeport's assets is huge.

<CHALID>: Both, the value. We need to get profit, so we can recover loans.

< SJAMSOEDDIN >: Also, we need to get clear calculation.

<CHALID>: How far along is your divestment, the percentage I mean?

< SJAMSOEDDIN>: 30% running.

<CHALID>: It's 9%, I think

< SJAMSOEDDIN>: 9.3% held by State-owned Enterprises (BUMN)

<NOVANTO>: If I'm not mistaken, Luhut has talked about this.

<CHALID>: Yes, Luhut has talked about it.

<NOVANTO>: Luhut has talked with Jim Bob. Luhut already has hunch, Sir.

<CHALID>: For me, I'll talk to Luhut not to take 20%, but 11% and the rest give it to [Jusuf Kalla] (9%). You need to be fair to avoid potential dispute.

<NOVANTO>: Yes. Luhut has talked to Jim Bob in San Diego four years ago. From total 30%, 10% paid here and another 10% paid through dividend. So it's borrowed but then paid in cash through dividend. That's how to do it, so as not to disturb the constellation. Once the Palace meddles in, the President doesn't like it, Luhut is then targeted. Now we know the key. The key is …like that… [laughter]… We want to see him successful. Both sides win. That's the strategy... [laughter]…

<SJAMSOEDDIN>: Lobbyist

57.     Despite Sjamsoeddin's efforts, the GOI did not agree to extend Freeport's COW in the time period discussed. News reports indicate that a deal was not reached because the parties involved were unable to agree upon certain terms. It was at this point that Sjamsoeddin provided the recording of the conversation to the current administration in what was seen as a maneuver to curry favor with Vice President Jusuf Kalla's political faction in advance of the upcoming elections. (While Novanto's party recently announced its support

24

for President Jokowi, the Golkar Party was formerly President Jokowi's primary opponent.) The recording prompted an investigation into Novanto by the GOI. Novanto initially resigned so as to allow the investigation to proceed without interfering in national politics. As of November 30, 2016, however, Indonesia's parliament reappointed Novanto as its Speaker after the country's attorney-general, parliament ethics panel, and constitutional court ruled in Novanto's favor. Novanto currently serves as Chairman of the Golkar Party, Indonesia's second-biggest political party.

### D. Defendants Materially Misrepresented the Status of Freeport's Compliance with the FCPA and the Status of COW Negotiations

58. As explained above, Freeport engaged in a scheme of bribery and corruption that violated the FCPA, Indonesian law, and internal corporate policy. Freeport's illegal and corrupt practices were material to investors and were required to be disclosed because, among other things, Freeport's chance of success was due, in part, to the use of improper and illegal business practices. Investors would have considered this information when evaluating the Company's outlook and, therefore, the truth would have altered the total mix of information available to the public.[1]

### February 27, 2015

59. Freeport filed an annual report (Form 10-K) with the SEC on February 27, 2015. The report provided investors with information about the Company's operations and finances for the fiscal year ended December 31, 2014. Adkerson signed the report on behalf of the Company.

60. The annual report stated, in pertinent part, as follows:

As further discussed in Item 1A. "Risk Factors," ***PT-FI has been engaged in discussions with officials of the Indonesian government since 2012 regarding various provisions of its COW***. The Indonesian government has sought to modify existing mining contracts, including PT-FI's COW, to

---

[1] Unless otherwise noted, emphasis within this Complaint is added and does not appear in the original documents.

address provisions of Indonesia's 2009 Mining Law and subsequent regulations, including with respect to the size of contract concessions, government revenues, domestic processing of minerals, divestment, provision of local services, conversion from a contract of work to a licensing framework for extension periods, and a requirement that extensions may be applied for only within two years prior to a contract of work's expiration.

In January 2014, the Indonesian government published regulations providing that holders of contracts of work with existing processing facilities in Indonesia may continue to export product through January 12, 2017, but established new requirements for the continued export of copper concentrates, including the imposition of a progressive export duty on copper concentrates. Despite PT-FI's rights under its COW to export concentrates without the payment of duties, PT-FI was unable to obtain administrative approval for exports and operated at approximately half of its capacity from mid-January 2014 through July 2014.

On July 25, 2014, PT-FI entered into a MOU with the Indonesian government under which PT-FI and the government agreed to negotiate an amended COW to address provisions related to the size of PT-FI's concession area, royalties and taxes, domestic processing and refining, divestment, local content, and continuation of operations post-2021. Execution of the MOU enabled the resumption of concentrate exports, which began in August 2014. The MOU has been extended to July 25, 2015. ***PT-FI is engaged in active discussions with the Indonesian government regarding an amended COW***.

***Provisions being addressed in the negotiation of an amended COW include the development of new copper smelting and refining capacity in Indonesia, divestment to the Indonesian government and/or Indonesian nationals of up to a 30 percent interest (an additional 20.64 percent interest) in PT-FI at fair value, and timely granting rights for the continuation of operations from 2022 through 2041. Negotiations are taking into consideration PT-FI's need for assurance of legal and fiscal terms post-2021 for PT-FI to continue with its large-scale investment program for the development of its underground reserves***.

. . .

***PT-FI is advancing plans for the construction of new smelter capacity in parallel with completing negotiations of its long-term operating rights and will also discuss the possibility of expanding industrial activities in Papua in connection with its long-term development plans***. PT-FI has identified a site adjacent to the existing PT Smelting site in Gresik, Indonesia, for the

construction of additional smelter capacity. Refer to "Mining Development Projects and Exploration" for further discussion.

61.    The annual report also stated, in pertinent part, as follows:

***Our international operations must comply with the U.S. Foreign Corrupt Practices Act and similar anti-corruption and anti-bribery laws of the other jurisdictions in which we operate***. There has been a substantial increase in the global enforcement of these laws. Any violation of these laws could result in significant criminal or civil fines and penalties, litigation, and loss of operating licenses or permits, and may damage our reputation, which could have a material adverse effect on our business, results of operations and financial condition.

62.    Freeport's annual report further stated, in pertinent part, as follows:

On July 25, 2014, PT-FI and the Indonesian government entered into a Memorandum of Understanding (MOU) under which PT-FI and the government agreed to negotiate an amended COW to address provisions related to the size of PT-FI's concession area, royalties and taxes, domestic processing and refining, divestment, local content, and continuation of operations post-2021. Execution of the MOU enabled the resumption of concentrate exports, which began in August 2014. The MOU has been extended to July 25, 2015. ***PT-FI is engaged in active discussions with the Indonesian government regarding an amended COW***.

***Provisions being addressed in the negotiation of an amended COW include the development of new copper smelting and refining capacity in Indonesia, divestment to the Indonesian government and/or Indonesian nationals of up to a 30 percent interest (an additional 20.64 percent interest) in PT-FI at fair value, and timely granting rights for the continuation of operations from 2022 through 2041. Negotiations are taking into consideration PT-FI's need for assurance of legal and fiscal terms post-2021 for PT-FI to continue with its large-scale investment program for the development of its underground reserves***.

63.    The statements featured above in Paragraphs 60-62 were misleading because they omitted material information concerning the nature of the negotiations Freeport was having with the GOI. By February 27, 2015, the date of the above statements, Adkerson and Moffett had already traveled to Indonesia to meet with high-ranking government officials in an attempt to secure the extension of the COW. These negotiations were in violation of

27

Indonesian regulations that prohibited Freeport from attempting to extend the COW outside of the two-year period prior to the COW's expiration. By violating Indonesian law, Adkerson and Moffett were also violating internal corporate policies pertaining to negotiations with foreign governments and/or entities.

64.     Further, while the above-statements provided investors with the impression that the Company's negotiations had been productive, the GOI officials with whom the Company met actually refused to engage in substantive discussions given that such discussions were prohibited under Indonesian law. As a result, Freeport elected to engage in a course of conduct involving Sjamsoeddin whereby Freeport would attempt to bribe and/or coerce the GOI into extending Freeport's COW prematurely and, as a result, risk subjecting the Company to harsh penalties under the FCPA and other applicable laws. The Company's descriptions of its ongoing negotiations with the GOI differed materially from what was actually occurring.

65.     The annual report also stated, in pertinent part, as follows:

In 1996, PT-FI established the Freeport Partnership Fund for Community Development (the Partnership Fund), through which PT-FI has made available funding and technical assistance to support community development initiatives in the areas of health, education and economic development of the area. PT-FI has committed through 2016 to provide one percent of its annual revenue for the development of the local people in its area of operation through the Partnership Fund. Our share of contributions to the Partnership Fund totaled $31 million in 2014, $41 million in 2013 and $39 million in 2012.

The Amungme and Kamoro Community Development Organization (*Lembaga Pengembangan Masyarakat Amungme dan Kamoro* or LPMAK) oversees disbursement of the program funds we contribute to the Partnership Fund. LPMAK is governed by a board of commissioners and a board of directors, which are comprised of representatives from the local Amungme and Kamoro tribal communities, government leaders, church leaders, and one representative of PT-FI on each board. The Amungme and Kamoro people are original inhabitants of the land in our area of operations. ***In addition to the Partnership Fund, PT-FI annually makes significant investments in public health, education, community infrastructure and economic development***.

66.     The report also stated, in pertinent part, as follows:

***Cash held at our international operations is generally used to support our foreign operations' capital expenditures, operating expenses, working capital and other tax payments or other cash needs***. Management believes that sufficient liquidity is available in the U.S. from cash balances and availability from our revolving credit facility and uncommitted lines of credit (refer to Note 8). With the exception of TFM, we have not elected to permanently reinvest earnings from our foreign subsidiaries, and we have recorded deferred tax liabilities for foreign earnings that are available to be repatriated to the U.S. From time to time, our foreign subsidiaries distribute earnings to the U.S. through dividends that are subject to applicable withholding taxes and noncontrolling interests' share.

67.     The statements featured above in Paragraphs 65-66 were misleading because they omitted material information concerning Freeport's past expenditures within Indonesia. The above-statements omitted the fact that Freeport had routinely and historically paid government officials, local businesses, and other Indonesian nationals money for services that either were not provided or were only provided in part. Freeport's practice of paying Indonesian persons and entities for services either not necessary or not performed violated the FCPA, internal corporate policy, and other applicable laws. As a result, Freeport's statements omitted the fact that its contributions to the GOI and Indonesian nationals subjected the Company to severe risks under the FCPA. The truth concerning these matters would have been considered by investors, as it would have allowed investors to accurately evaluate the Company's business practices and risk profile. This information was material because it would have altered the total mix of information available to the public.

68.     Freeport accompanied the annual report with certifications from Adkerson and Quirk pursuant to the Sarbanes-Oxley Act of 2002. The certifications, made by each Adkerson and Quirk, stated as follows:

1.     I have reviewed this annual report on Form 10-K of Freeport-McMoRan Inc.;

2.     ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under***

29

*which such statements were made, not misleading with respect to the period covered by this report*;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)   *Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared*;

(b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)   *Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation*; and

(d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

69.   Adkerson's and Quirk's certifications were materially misleading considering that the Company's annual report contained untrue statements of material fact and/or omitted to state material facts necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading. Specifically, Freeport's annual report did not disclose Adkerson's and Moffett's previous visits to Indonesia, attempts to secure the COW extension, and the GOI's refusal to engage in discussions concerning the GOI. Furthermore, the annual report failed to disclose that Freeport had decided to engage in a course of conduct involving Sjamsoeddin whereby Freeport would attempt to bribe and/or coerce the GOI into extending Freeport's COW prematurely.

70.   In addition, the Company's annual report failed to properly disclose the truth concerning Freeport's payments to the GOI and persons and entities within Indonesia, which were illegal and in violation of the FCPA, internal corporate policy, and other applicable law. These omission rendered Adkerson's and Quirk's certifications materially misleading.

71.   One of the objectives of the Sarbanes-Oxley Act of 2002 was to give investors assurance over transparency and accurate reporting. The certifications signed by Adkerson and Quirk provided investors with a "personal stamp" of approval with regard to the Company's disclosures. Investors relied on these certifications as proof that Freeport's annual report was accurate in all material respects. The truth about Adkerson's and Quirk's certifications was material, as it would have altered the total mix of information available to the public.

31

**April 23, 2015**

72.     Freeport held an investor conference call on April 23, 2015. Participants on the call included Adkerson, Quirk, and Moffett. The purpose of the call was to discuss Freeport's earnings and operations for the first quarter of fiscal 2015. During the call, the Company also discussed its ongoing activity in Indonesia and its efforts vis-à-vis the GOI to extend its COW.

73.     Adkerson, in pertinent part, stated as follows during the call:

> ***In Indonesia we continue to be engaged in active discussions with the government to amend our COW. The government has expressed – government officials have expressed a recognition of our need for certainty in terms of our fiscal terms and our operating rights. And we are working cooperatively with the government on how to accomplish this within the government's regulatory framework***.
>
> A lot of mutual benefits for us, our Company and for the country of Indonesia with the operations in Papua. We have had a very long-term positive partnership. We are working hard to sustain that in an environment of changes in government and expectations and aspirations in Indonesia.
>
> But this operation is the economic engine for the development in Papua, and that is something that we share in common with the government of Indonesia and with our own Company. It provides significant benefits to the Indonesian economy. ***As we stand right now, all of our rights under our COW continue to be applied until we reach a mutually agreeable approach to amending that. And these negotiations are taking place***.

74.     The statement featured above in Paragraph 73 was misleading because it omitted material information concerning the nature of the negotiations Freeport was having with the GOI. By April 23, 2015, the date of the above statement, Adkerson and Moffett had already traveled to Indonesia to meet with high-ranking government officials in an attempt to secure the extension of the COW. These negotiations were unsuccessful given the fact that the GOI refused to hold substantive discussions. Further, not only had Adkerson and Moffett already violated internal corporate policy at this point, but Freeport engaged the assistance of Sjamsoeddin to execute a scheme whereby the Company would bribe and/or coerce the GOI

32

into extending Freeport's COW. While the above-statement provided investors with the impression that the Company's negotiations were resulting in positive progress, they had in fact been negative in terms of overall success and had led to Freeport's decision to engage in a course of conduct that would subject the Company to the risk of harsh penalties under the FCPA and other applicable laws.

75.     The Company's description of its ongoing negotiations with the GOI differed materially from what was actually occurring. Had Adkerson accurately disclosed the status of the Company's negotiations vis-à-vis the Indonesian government, investors would have been able to better evaluate the prospects of Freeport in Indonesia as well as the risk profile of their investments. This information would have altered the total mix of information available to investors and, therefore, was material.

### May 8, 2015

76.     Freeport filed a quarterly report (Form 10-Q) with the SEC on May 8, 2015. The report provided investors with information about the Company's operations and finances for the three-month period ended March 31, 2015. Whitmire signed the report on behalf of the Company.

77.     The quarterly report stated, in pertinent part, as follows:

*PT-FI is engaged in active discussions with the Indonesian government regarding its Contract of Work (COW) and long-term operating rights*. The parties entered into a Memorandum of Understanding (MOU) related to an amended COW in July 2014, which was extended to July 25, 2015. *Negotiations are taking into consideration PT-FI's requirement for assurance of legal and fiscal terms post-2021 for PT-FI to continue with its large-scale investment program in Papua, Indonesia*.

*PT-FI is advancing plans for the construction of new smelter capacity in parallel with completing negotiations on its COW and long-term operating rights*. PT-FI has identified a site adjacent to the existing PT Smelting site in Gresik, Indonesia, for the construction of additional smelter capacity and is in discussions with potential partners for the project.

78.    The statement featured above in Paragraph 77 was misleading because it omitted material information concerning the nature of the negotiations Freeport was having with the GOI. By May 8, 2015, the date of the above statements, Adkerson and Moffett had already failed in terms of their personal meetings with high-ranking government officials in an attempt to secure the extension of the COW. Further, as a result of Adkerson's and Moffett's failures, Freeport had hired Sjamsoeddin to engage in direct communications with GOI officials in an attempt to secure the extension. By the date of the above-statement, Sjamsoeddin had already met at least once with Novanto and, at that time, attempted to force Novanto into facilitating the extension with the threat of international arbitration. These negotiations were in violation of Indonesian regulations that prohibited Freeport from attempting to extend the COW outside of the two-year period prior to the COW's expiration. By violating Indonesian law, Adkerson, Moffett, and Sjamsoeddin were also violating internal corporate policies pertaining to negotiations with foreign governments and/or entities.

79.    Further, while the above-statements provided investors with the impression that the Company's negotiations had been productive, the GOI officials with whom the Company met actually refused to engage in substantive discussions given that such discussions were prohibited under Indonesian law. Freeport's continued efforts, especially in light of Sjamsoeddin's conduct, subjected the Company to risks associated with FCPA violations and other applicable laws. The Company's descriptions of its ongoing negotiations with the GOI differed materially from what was actually occurring.

80.    The quarterly report also stated, in pertinent part, as follows:

***Cash held at our international operations is generally used to support our foreign operations' capital expenditures, operating expenses, working capital and other tax payments, or other cash needs***. Management believes that sufficient liquidity is available in the U.S. from cash balances and availability from our revolving credit facility and uncommitted lines of credit (see discussion below). With the exception of TFM, we have not elected to permanently reinvest earnings from our foreign subsidiaries, and we have recorded deferred tax liabilities for foreign earnings that are available to be

repatriated to the U.S. From time to time, our foreign subsidiaries distribute earnings to the U.S. through dividends that are subject to applicable withholding taxes and noncontrolling interests' share.

81.     The statement featured above in Paragraph 80 was misleading because it omitted material information concerning Freeport's past expenditures within Indonesia. The above-statements omitted the fact that Freeport had routinely and historically paid government officials, local businesses, and other Indonesian nationals money for services that either were not provided or were only provided in part. Freeport's practice of paying Indonesian persons and entities for services either not necessary or not performed violated the FCPA, internal corporate policy, and other applicable laws. As a result, Freeport's statements omitted the fact that its contributions to the GOI and Indonesian nationals subjected the Company to severe risks under the FCPA. The truth concerning these matters would have been considered by investors, as it would have allowed investors to accurately evaluate the Company's business practices and risk profile. This information was material because it would have altered the total mix of information available to the public.

82.     Freeport accompanied the quarterly report with certifications from Adkerson and Quirk pursuant to the Sarbanes-Oxley Act of 2002. The certifications, made by each Adkerson and Quirk, stated as follows:

1.     I have reviewed this quarterly report on Form 10-Q of Freeport-McMoRan Inc.;

2.     ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as

defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) *Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared*;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) *Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation*; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

83.     Adkerson's and Quirk's certifications were materially misleading considering that the Company's quarterly report contained untrue statements of material fact and/or omitted to state material facts necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading. Specifically, Freeport's quarterly report did not disclose Freeport's previous attempts to obtain the COW extension, which violated Indonesian law, internal corporate policy, and subjected the Company to severe risks under the FCPA. Furthermore, the Company's quarterly report failed to accurately describe its past payments to Indonesian entities and/or persons in that these payments were made for either services not performed or services not necessary and, therefore, in violation of the FCPA and internal corporate policy. These omission rendered Adkerson's and Quirk's certifications materially misleading. Given that investors relied upon the certifications for proof that Freeport's quarterly report as materially accurate in all respects, these omissions were material.

### May 12, 2015

84.     Freeport participated in the Bank of America Global Metals and Mining Conference in Barcelona, Spain, on May 12, 2015. Adkerson presented at the conference on behalf of the Company. During the Conference, the Company discussed its ongoing activity in Indonesia and its efforts vis-à-vis the GOI to extend its COW.

85.     Adkerson, in pertinent part, stated as follows during the presentation:

*In Indonesia, we continue in our discussions with the government on amending our CoW*. We are working hard to maintain our very positive long-term relationship with the government of Indonesia and the people of Papua. Freeport has been operating there since the early 1970s. *And we have issues with the government that we've been addressing now.* We have a memorandum of understanding that provides a framework for reaching an agreement on those issues. *It's in everyone's interest -- the country, the people, our workforce, certainly our shareholders and partners -- for us to resolve this on a mutually acceptable basis, and we are confident we'll be able to do that.*

Our primary objective in these negotiations is to establish what we really have now in our existing contract. And that's an assurance on fiscal and

operating terms for the long run. Indonesia changed its laws to go away from a Contract Of Work system towards a licensing system where operators are subject to prevailing laws as it applies to taxes, royalties, and the like. We believe it's important for us and for miners in general, but, looking at our situation in specific, to have a framework that gives us surety about fiscal terms and the rights to operate. And that's our bottom-line issue that we are talking with the government about. ***We've agreed to make some concessions, including working to build new smelting capacity in Indonesia to be responsive to the aspirations of the government and the people there. But we believe the changes that we've agreed to accept as a package for a continuation of our rights to operate with assured terms is a reasonable way for all of us to go forward, and we are confident we'll get there.***

86.     The statement featured above in Paragraph 85 was misleading because it omitted material information concerning the nature of the negotiations Freeport was having with the GOI. By May 12, 2015, the date of the above statement, Adkerson and Moffett had already failed in their efforts to secure the extension for the COW and, as a result, caused Freeport to hire Sjamsoeddin. Sjamsoeddin, by this point in time, had already engaged in at least one back-channel communication with Novanto and would be meeting with Novanto again the very next day on May 13, 2015. While the above-statement provided investors with the impression that the Company's negotiations were resulting in positive progress, they had in fact been negative in terms of overall success and had led to Freeport's decision to engage in a course of conduct that would subject the Company to the risk of harsh penalties under the FCPA and other applicable laws.

87.     The Company's description of its ongoing negotiations with the GOI differed materially from what was actually occurring. Had Adkerson accurately disclosed the status of the Company's negotiations vis-à-vis the Indonesian government, investors would have been able to better evaluate the prospects of Freeport in Indonesia as well as the risk profile of their investments. This information would have altered the total mix of information available to investors and, therefore, was material.

**June 3, 2015**

88.    Freeport participated in the Deutsche Bank Global Industrials and Basic Materials Conference in Chicago, Illinois, on June 3, 2015. Quirk presented at the conference on behalf of the Company. During the Conference, the Company discussed its ongoing activity in Indonesia and its efforts vis-à-vis the GOI to extend its COW.

89.    Quirk, in pertinent part, stated as follows during the presentation:

Indonesia, ***where we are continuing to actively engage with the government regarding our contract of work***, as you might recall, we reached agreement last July with the government on six points. And we agreed to document those six points in an amendment to our contract of work.

***There's been a government change since then. And we're working cooperatively with the new administration on this. And we're very positive about our partnership with the government. We provide significant benefits to not only the central government but the local communities where we operate.***

Part of our commitment with the contract extension will be to do a new smelter in Indonesia. ***We're working with partners and advancing plans for that in parallel with our contract for work negotiations***. We have a lot of confidence in our ability to continue to deliver value from the resources in Indonesia.

We have a very long-term asset there. We're making investments in the future. We've been doing this for a number of years. We're getting to the point where our open pit production is going to deplete in 2017. And so, we've been making investments to replace that with our underground large-scale block caving operations, where we've had a lot of history with in Indonesia. And all of that is going very well.

. . .

We're looking at constructing a second smelter in the country and, to Jorge's point, to align ourselves with the aspirations of the government. ***This is being done in parallel with our -- to secure our long-term rights. So, that's one of the things that we're talking to the government about is that we'll make commitments on the smelter subject to getting our long-term rights secured.***

***But, in parallel with the discussions we're having with the government over our contract rights, we're also advancing the smelter opportunity. We're***

39

***not committing big capital right now until we get the contract dealt with.
But, we are advancing our plans.*** We've located a potential site for the
facility. We've been working with engineering firms regarding engineering
for the new facility. We're working with partners to talk about potential
partnering arrangements for it. And also, we're looking at financing
arrangements for it.

90.     The statement featured above in Paragraph 89 was misleading because it
omitted material information concerning the nature of the negotiations Freeport was having
with the GOI. By June 3, 2015, the date of the above statement, Adkerson and Moffett had
already failed in their efforts to secure the extension for the COW and, as a result, caused
Freeport to hire Sjamsoeddin. Sjamsoeddin, by this point in time, had already engaged in at
least two private communications with Novanto, the most recent of which occurring on May
13, 2015 where Sjamsoeddin reiterated his threats of international arbitration. While the
above-statement provided investors with the impression that the Company's negotiations
were resulting in positive progress, they had in fact been negative in terms of overall success
and had led to Freeport's decision to engage in a course of conduct that would subject the
Company to the risk of harsh penalties under the FCPA and other applicable laws.

91.     The Company's description of its ongoing negotiations with the GOI differed
materially from what was actually occurring. Had Quirk accurately disclosed the status of the
Company's negotiations vis-à-vis the Indonesian government, investors would have been
able to better evaluate the prospects of Freeport in Indonesia as well as the risk profile of
their investments. This information would have altered the total mix of information available
to investors and, therefore, was material.

### July 23, 2015

92.     Freeport held an investor conference call on July 23, 2015. Participants on the
call included Adkerson, Quirk, and Moffett. The purpose of the call was to discuss
Freeport's earnings and operations for the second quarter of fiscal 2015. During the call, the
Company also discussed its ongoing activity in Indonesia and its efforts vis-à-vis the GOI to
extend its COW.

93.   Adkerson, in pertinent part, stated as follows during the call:

An important area of attention for our Company has been working with the government of Indonesia in terms of securing a mutually acceptable agreement on our long-term operating rights. We have in place a contract of work, our second contract that was signed in Indonesia but it was a contract that was signed in 1991 that had a 30 year primary term extending to 2021. And, by its terms, giving us the rights to two ten-year extensions beyond that in accordance with the terms of that contract. That contract provides us the necessary legal and physical assurance that gives us the confidence to be able to make the long-term capital investments.

And we're investing $15 billion to develop our underground resources to replace the open pit reserves as it is depleted. ***This extension requires approval by the government of Indonesia, but under the contract that cannot be unreasonably withheld.***

***We've had discussions now for a number of months with the government on how to deal with our contractual rights with new mining laws and regulations that have been adopted in the country of Indonesia. And what we have worked together with the government to do is to find a mutually satisfactory solution that provides our shareholders the confidence that the need for us to continue to make investments. And also be responsive to the aspirations of the government of Indonesia and the new mining law regime.***

The rights under our contract currently continue until we agree to find a way forward which may provide involve some amendments to it. As part of our efforts to be responsive to the government, we are working on developing new smelting capacity in Indonesia and we've made some significant progress in terms of identifying sites and partnership arrangements and contract arrangements for that project. ***That would be in parallel with our resolution of our COW situation.***

We have submitted our application for renewal for our export license for the next six months, and believe we are making progress with the government in securing that. We do have a long-term record that goes back 40 years now of working successfully in Indonesia in a positive way to partnership with the government and local community. Our operations have been the primary economic driver for development in Poplin. We want to continue to attribute to that, to be part of that as well as providing significant overall benefits to the Indonesian economy.

The direct benefits have been $18 billion over the past seven years and the split of those benefits has been 60% for the government, 40% for Freeport.

*Our chairman Jim Bob Moffett has been in Indonesia directly involved in discussions with government officials.* He's there now and, Jim Bob, I'd like to turn the call over to you to make whatever comment you'd like to make.

94.     Moffett then stated the following during the call:

I'll save other comments for the Q&A, but *I just want to say that we're making good progress on extending our export license and we expect to continue under our amended COW which has a primary term until 2021 with two ten-year extensions. So, I'm here trying to make sure that we get this right since we're talking about 2041 which is an important time.* Because in that period of time, we will be finishing our underground operations and going under the open pit mine and bringing our deep level mine zone on production and become the largest underground mine in the world, and as you've seen we continue to have made engineering successful in Papua. So as you've seen from the press clippings, the ministry of mines has indicated it'll all be (inaudible) and we hope to get this concluded over the next several days.

Thanks Richard, and I'll save the rest for Q&A.

95.     During the question and answer portion of the call, Adkerson stated further that:

*So that's what we're really focused on -- is how do we have a preservation of our rights to operate beyond the primary term of our existing COW. It has a 20-year provision for continued operations. And then to ensure that the terms, fiscally and legally that we have beyond the COW or through an extension of the COW, give us that degree of assurance.*

We've indicated a degree of flexibility in working with the government, so long as that's achievable. *Achieving that within the framework of the existing laws and regulations in the country is complicated.* Probably the most straightforward way would be to find a way of reaching a mutual agreement on continuing the COW. *But we've expressed that we would be flexible in dealing with that so long as we could achieve our fundamental objectives of assurance about operating rights, fiscal terms, legal enforceability, for the long run.*

. . .

There is an issue with the public perception of how does the contract interact with the laws. *The legal situation is clear-cut. And so we have opted -- and I really believe this is the right answer, and our Board, Jim Bob (inaudible)*

*support it -- is that we will be much better suited if we can find a way of dealing with this in a cooperative fashion that is responsive to the public opinion and aspirations of the government, rather than just digging our heels in and saying the contract is a contract.*

96.     Further to Adkerson's comments, Moffett stated that:

This is Jim Bob. Let me just comment on a couple of things. As you've seen in the press the last couple of days, the government has indicated that they're going to extend our contract. And they're going to use the export license. We and they are talking because as a matter of fact when the MOU expires on July 25, two days from now, the new COW is what becomes the controlling document.

That COW, other than the few amendments we've agreed to, is still in force in effect until 2021. We've made agreements that are still in force in effect. And as you've seen in some of the government announcements, it basically says that we have not changed anything. *And the reason that we are [staying] our current [process] is before we make any kind of concessions or the government makes any kind of concessions, we're trying to end up with a win-win situation. And that's where this thing is headed.*

97.     Moffett stated again, later in the call in response to an analyst question, that Freeport had all but secured the COW extension through its negotiation efforts:

<Analyst>: Did I hear Jim Bob right -- that *you expect to reach an agreement on the contractor work and also those permits in the next couple of days*?

<Moffett>: *That's exactly right.* Let me just read you the Dow Jones clip that came out yesterday on July 22, 2015. You can look it up in the latest clips. It talks about the investment that we're going to be making and extending the contract for another 20 years.

This is coming from the minister. The minister cited earlier the government of Indonesia does not have any intention to terminate the contract after 2021. The government and we both have tried to get the agreement finalized here. And if you go down to the next clip, which was from July 22, 2015 by Indonesia Finance Today, it's a Bloomberg announcement, it says from the minister once again "Freeport still has a contract valid until 2021. The President said prepare for an investment, not to cut ties."

43

1
2
3
4
5
6

The answer is, the reason why it I'm trying to measure my words when you're in negotiations it is really hard on a call like this to talk about the negotiations, but *the answer is all the public statements you've seen is what the government has done and which you can verify, that they want us to continue. And we obviously have every reason to continue under proper terms. The proper terms are going to be we need to get the certainty that we can continuously get the contract to work whether you are talking about a mining license, IUPK or COW. We need to have the same fiscal certainty and that's why I'm staying here to make sure that we accomplish that.*

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

98.     The statements featured above in Paragraphs 93-97 were misleading because they omitted material information concerning the nature of the negotiations Freeport was having with the GOI. By July 23, 2015, the date of the above statement, Adkerson and Moffett had already failed in their efforts to secure the extension for the COW and, as a result, caused Freeport to hire Sjamsoeddin. Sjamsoeddin, by this point in time, had engaged in at least three private communications with Novanto, the most recent of which occurring on June 8, 2015 where Sjamsoeddin attempted to bribe Novanto and other GOI officials with promises of capital investments, divestment of shares, and joint business ventures intended to benefit select officials within the GOI. While the above-statement provided investors with the impression that the Company's problems relating to the COW extension were all but resolved, the negotiations had in fact been negative in terms of overall success given the GOI's firm position on compliance with Indonesian laws prohibiting negotiations of the COW prior to the two-year period before the COW expired. Further, absent from the above-statements is any indication that Freeport's conduct with regard to the COW negotiations had already exposed the Company to the risk of harsh penalties under the FCPA and other applicable laws.

24
25
26
27

99.     The Company's description of its ongoing negotiations with the GOI differed materially from what was actually occurring. Had Quirk accurately disclosed the status of the Company's negotiations vis-à-vis the Indonesian government, investors would have been able to better evaluate the prospects of Freeport in Indonesia as well as the risk profile of

28

AMENDED COMPLAINT
No. CV-00186-PHX-DJH

their investments. This information would have altered the total mix of information available to investors and, therefore, was material.

**August 10, 2015**

100.    Freeport filed a quarterly report (Form 10-Q) with the SEC on August 10, 2015. The report provided investors with information about the Company's operations and finances for the three-month period ended June 30, 2015. Whitmire signed the report on behalf of the Company.

101.    The quarterly report stated, in pertinent part, as follows:

> ***PT-FI continues to engage in active discussions with the Indonesian government regarding its COW and long-term operating rights. Negotiations are taking into consideration PT-FI's requirement for assurance of legal and fiscal terms post-2021 for PT-FI to continue with its large-scale investment program in Papua, Indonesia.***
>
> ***PT-FI is advancing plans for the construction of new smelter capacity in parallel with completing negotiations on its COW and long-term operating rights.*** PT-FI has identified potential sites for the construction of additional smelter capacity and is in discussions with potential partners for the project.
>
> ***We expect, but cannot provide any assurance, that PT-FI will be successful in reaching a satisfactory agreement on the terms of its long-term mining rights.*** If PT-FI is unable to reach agreement with the Indonesian government on its long-term rights, we may be required to reduce or defer investments in underground development projects, which could have a material adverse effect on PT-FI's future production and reserves. In addition, PT-FI would intend to pursue any and all claims against the Indonesian government for breach of contract through international arbitration.

102.    The statement featured above in Paragraph 101 was misleading because it omitted material information concerning the nature of the negotiations Freeport was having with the GOI. By August 10, 2015, the date of the above statement, Adkerson and Moffett had already failed in their efforts to secure the extension for the COW. Sjamsoeddin was similarly failing in his efforts to force the COW extension, notwithstanding his threats of international arbitration and offers of various lucrative business opportunities and interests. The above-statement failed to disclose an accurate description of Freeport's past negotiation

45

efforts and the fact that these efforts had resulted in a negative outcome in terms of overall success given the GOI's firm position on compliance with Indonesian laws prohibiting negotiations of the COW prior to the two-year period before the COW expired. Further, absent from the above-statements is any indication that Freeport's conduct with regard to the COW negotiations had already exposed the Company to the risk of harsh penalties under the FCPA and other applicable laws.

103.    The Company's description of its ongoing negotiations with the GOI differed materially from what was actually occurring. Had Quirk accurately disclosed the status of the Company's negotiations vis-à-vis the Indonesian government, investors would have been able to better evaluate the prospects of Freeport in Indonesia as well as the risk profile of their investments. This information would have altered the total mix of information available to investors and, therefore, was material.

104.    The quarterly report also stated, in pertinent part, as follows:

> ***Cash held at our international operations is generally used to support our foreign operations' capital expenditures, operating expenses, working capital and other tax payments, or other cash needs.*** With the exception of TFM, we have not elected to permanently reinvest earnings from our foreign subsidiaries, and we have recorded deferred tax liabilities for foreign earnings that are available to be repatriated to the U.S. From time to time, our foreign subsidiaries distribute earnings to the U.S. through dividends that are subject to applicable withholding taxes and noncontrolling interests' share.

105.    The statement featured above in Paragraph 104 was misleading because it omitted material information concerning Freeport's past expenditures within Indonesia. The above-statements omitted the fact that Freeport had routinely and historically paid government officials, local businesses, and other Indonesian nationals money for services that either were not provided or were only provided in part. Freeport's practice of paying Indonesian persons and entities for services either not necessary or not performed violated the FCPA, internal corporate policy, and other applicable laws. As a result, Freeport's statements omitted the fact that its contributions to the GOI and Indonesian nationals subjected the Company to severe risks under the FCPA. The truth concerning these matters

46

would have been considered by investors, as it would have allowed investors to accurately evaluate the Company's business practices and risk profile. This information was material because it would have altered the total mix of information available to the public.

106.   Freeport accompanied the quarterly report with certifications from Adkerson and Quirk pursuant to the Sarbanes-Oxley Act of 2002. The certifications, made by each Adkerson and Quirk, stated as follows:

1.   I have reviewed this quarterly report on Form 10-Q of Freeport-McMoRan Inc.;

2.   ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)   ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared***;

(b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

47

(c)   ***Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation***; and

(d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

107.   Adkerson's and Quirk's certifications were materially misleading considering that the Company's quarterly report contained untrue statements of material fact and/or omitted to state material facts necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading. Specifically, Freeport's quarterly report did not disclose Freeport's previous attempts to obtain the COW extension, which violated Indonesian law, internal corporate policy, and subjected the Company to severe risks under the FCPA. Furthermore, the Company's quarterly report failed to accurately describe its past payments to Indonesian entities and/or persons in that these payments were made for either services not performed or services not necessary and, therefore, in violation of the FCPA and internal corporate policy. These omission rendered Adkerson's and Quirk's certifications materially misleading. Given that investors relied upon

48

the certifications for proof that Freeport's quarterly report as materially accurate in all respects, these omissions were material.

**October 22, 2015**

108.    Freeport held an investor conference call on October 22, 2015. Participants on the call included Adkerson and Quirk. The purpose of the call was to discuss Freeport's earnings and operations for the third quarter of fiscal 2015. During the call, the Company also discussed its ongoing activity in Indonesia and its efforts vis-à-vis the GOI to extend its COW.

109.    Adkerson stated on the call, in pertinent part, as follows:

And then as we go forward, as we look in the first 10 years of the life of mine average for this underground operation, we will be, through our Company's interest, achieving 1.1 billion pounds of copper, and 1.5 million ounces of gold a year. ***So that's the reason why we're spending this money, and working hard to secure our contract rights. This spending is conditional on getting the approval of the government, on acceptable terms, for an extension of our contract. And with this new step that we've gotten, which we got a quote from the letter that we received earlier this month on page 12, we feel that an important step has been made in getting documentation of these contract rights, on a basis that's acceptable to us and to the government***.

***Jim Bob met with the President in Indonesia, and worked with the mine minister in securing this commitment. And it's a very, very important step for us***. At the same time, we are progressing with our negotiations with union officials, and expect to have our new CLA approved imminently.

110.    During the question and answer portion of the call, Adkerson made the following additional statements about Freeport's negotiations with the GOI:

Thanks, Brian. We agreed last year, when we signed a memorandum of understanding with the government that allowed us to go forward with restoring exports at the time, and also set the stage for further discussions with the government, leading to this recent letter.

At that point, we agreed to increase the royalties that were in our contract of work to the royalties that were specified in the 2009 mining law. That was a concession we made to meet the government's aspirations.

And so in our discussions with the government now, those are the royalty rates that would be reflected in our extended contract, going forward. And they would be fixed. They wouldn't be subject to further changes.

*So the -- like we see here in the United States, with this presidential campaign, there will be a lot of comments, politically, coming out of Indonesia. But that's the facts of where we are with our royalties, and with this recent understanding with the government, about how we'll go forward*.

. . .

No, Tony, it's not off the table. Throughout this whole process, our position has been, and now the government supports it, it was in the MOU in mid-2014. It's reflected in what the letter says, is that any divestment would be on the basis of fair values. And exactly how we'd invest depends on how we work with the government on it.

The government, the central government itself, will have the opportunity to acquire shares. They've had that opportunity in the past, and haven't elected to do it, but we will work with them on it. The possibility of sales to state-owned companies is there.

The possibility of an IPO is something we've done work on, and we can see some benefits to that, to be traded on the Indonesia exchange. Government officials would. Some government officials are very supportive of that.

*So all of this process is, again, conditional on getting the final documentation of the extension, and then we're prepared immediately, at that point, to go forward in working with the government, as to exactly how to do that*. But the IPO is certainly one of the alternatives that we'll be talking with them about.

111.   The statements featured above in Paragraphs 109-10 were misleading because they omitted material information concerning the nature of the negotiations Freeport was having with the GOI. By October 22, 2015, the date of the above statement, Adkerson and Moffett had already failed in their efforts to secure the extension for the COW. Sjamsoeddin was similarly failing in his efforts to force the COW extension, notwithstanding his threats of international arbitration and offers of various lucrative business opportunities and interests to select GOI officials. The above-statement failed to disclose an accurate description of

50

1   Freeport's past negotiation efforts and the fact that these efforts had resulted in a negative

2   outcome in terms of overall success given the GOI's firm position on compliance with

3   Indonesian laws prohibiting negotiations of the COW prior to the two-year period before the

4   COW expired. Further, absent from the above-statements is any indication that Freeport's

5   conduct with regard to the COW negotiations had already exposed the Company to the risk

6   of harsh penalties under the FCPA and other applicable laws.

7   112.   Moreover, while Adkerson indicated that the GOI had provided the Company

8   with assurances concerning the extension of the COW, the GOI disputed such claims in an

9   interview with *Tempo* magazine. According to *Tempo* magazine, Minister of Energy &

10  Mineral Resources Sudirman Said denied Freeport's claim that the GOI agreed, confirmed,

11  or otherwise represented that the COW would be extended, stating that "There have been no

12  words to indicate to indicate [sic] the contract has been extended." Minister Said stated

13  further that, "There has been no decision on the extension. They can request an extension

14  and we will respond according to the existing regulations." Minister Said also clarified that

15  "[t]here's no such thing" in terms of "a plan to revise the rules regarding extensions" and

16  when a company can permissibly begin negotiations prior to expiration. *Tempo* magazine

17  posed the question of whether the GOI agreed to Freeport's extension several times; in each

18  instance, Minister Said answered unequivocally that it had not. To date, Freeport's COW has

19  not been extended by the GOI.

20  113.   The Company's description of its ongoing negotiations with the GOI differed

21  materially from what was actually occurring. Had Quirk accurately disclosed the status of the

22  Company's negotiations vis-à-vis the Indonesian government, investors would have been

23  able to better evaluate the prospects of Freeport in Indonesia as well as the risk profile of

24  their investments. This information would have altered the total mix of information available

25  to investors and, therefore, was material.

26  **November 6, 2015**

27  114.   Freeport filed a quarterly report (Form 10-Q) with the SEC on November 6,

28  2015. The report provided investors with information about the Company's operations and

51

finances for the three-month period ended September 30, 2015. Whitmire signed the report on behalf of the Company.

115. The quarterly report stated, in pertinent part, as follows:

*PT-FI has advanced discussions with the Indonesian government regarding its COW and long-term operating rights.* The Indonesian government is currently developing economic stimulus measures, which include revisions to mining regulations, to promote economic and employment growth. In consideration of PT-FI's major investments, and prior and ongoing commitments to increase benefits to Indonesia, including previously agreed higher royalties, domestic processing, divestment and local content, *the Indonesian government provided a letter of assurance to PT-FI in October 2015 indicating that it will approve the extension of PT-FI's operations beyond 2021, and provide the same rights and the same level of legal and fiscal certainty provided under its current COW.*

*PT-FI is advancing plans for the construction of new smelter capacity in parallel with completing negotiations on its COW and long-term operating rights.* PT-FI has identified potential sites and is developing plans for the construction of additional smelter capacity. We are engaged in discussions with potential partners for the project.

As previously reported and upon completion of its amended COW, we and PT-FI have agreed to a divestment to the Indonesian government and/or Indonesian nationals of up to a 30 percent interest (an additional 20.64 percent) in PT-FI at fair market value.

*We expect, but cannot provide any assurance, that PT-FI will be successful in reaching a satisfactory agreement on the terms of its long-term mining rights.* If PT-FI is unable to reach agreement with the Indonesian government on its long-term rights, we may be required to reduce or defer investments in underground development projects, which could have a material adverse effect on PT-FI's future production and reserves. In addition, PT-FI would intend to pursue any and all claims against the Indonesian government for breach of contract through international arbitration.

116. The statement featured above in Paragraphs 115 was misleading because it omitted material information concerning the nature of the negotiations Freeport was having with the GOI. By November 6, 2015, the date of the above statement, Adkerson and Moffett had already failed in their efforts to secure the extension for the COW. Sjamsoeddin was

similarly failing in his efforts to force the COW extension. The above-statement failed to disclose an accurate description of Freeport's past negotiation efforts and the fact that these efforts had resulted in a negative outcome in terms of overall success given the GOI's firm position on compliance with Indonesian laws prohibiting negotiations of the COW prior to the two-year period before the COW expired. Contrary to Freeport's representation that the GOI had agreed or provided assurances with regard to the COW extension, Minister of Energy & Mineral Resources stated in no uncertain terms that the GOI had in fact not agreed to anything and that Freeport would have to comply with Indonesian regulations in their entirety. Further, absent from the above-statements is any indication that Freeport's conduct with regard to the COW negotiations had already exposed the Company to the risk of harsh penalties under the FCPA and other applicable laws.

117.   The Company's description of its ongoing negotiations with the GOI differed materially from what was actually occurring. Had Quirk accurately disclosed the status of the Company's negotiations vis-à-vis the Indonesian government, investors would have been able to better evaluate the prospects of Freeport in Indonesia as well as the risk profile of their investments. This information would have altered the total mix of information available to investors and, therefore, was material.

118.   The quarterly report also stated, in pertinent part, as follows:

> **Cash held at our international operations is generally used to support our foreign operations' capital expenditures, operating expenses, working capital and other tax payments, or other cash needs.** With the exception of TFM, we have not elected to permanently reinvest earnings from our foreign subsidiaries, and we have recorded deferred tax liabilities for foreign earnings that are available to be repatriated to the U.S. From time to time, our foreign subsidiaries distribute earnings to the U.S. through dividends that are subject to applicable withholding taxes and noncontrolling interests' share.

119.   The statement featured above in Paragraph 118 was misleading because it omitted material information concerning Freeport's past expenditures within Indonesia. The above-statements omitted the fact that Freeport had routinely and historically paid government officials, local businesses, and other Indonesian nationals money for services

that either were not provided or were only provided in part. Freeport's practice of paying Indonesian persons and entities for services either not necessary or not performed violated the FCPA, internal corporate policy, and other applicable laws. As a result, Freeport's statements omitted the fact that its contributions to the GOI and Indonesian nationals subjected the Company to severe risks under the FCPA. The truth concerning these matters would have been considered by investors, as it would have allowed investors to accurately evaluate the Company's business practices and risk profile. This information was material because it would have altered the total mix of information available to the public.

120.    Freeport accompanied the quarterly report with certifications from Adkerson and Quirk pursuant to the Sarbanes-Oxley Act of 2002. The certifications, made by each Adkerson and Quirk, stated as follows:

1.    I have reviewed this quarterly report on Form 10-Q of Freeport-McMoRan Inc.;

2.    ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared***;

54

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) ***Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation***; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

121.    Adkerson's and Quirk's certifications were materially misleading considering that the Company's quarterly report contained untrue statements of material fact and/or omitted to state material facts necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading. Specifically, Freeport's quarterly report did not disclose Freeport's previous attempts to obtain the COW extension, which violated Indonesian law, internal corporate policy, and subjected the Company to severe risks under the FCPA. The quarterly report also failed to provide

55

accurate disclosures concerning what Freeport referred to as "assurances" from the GOI, which were subsequently disputed by the GOI's Ministry of Energy & Mineral Resources. Furthermore, the Company's quarterly report failed to accurately describe its past payments to Indonesian entities and/or persons in that these payments were made for either services not performed or services not necessary and, therefore, in violation of the FCPA and internal corporate policy. These omission rendered Adkerson's and Quirk's certifications materially misleading. Given that investors relied upon the certifications for proof that Freeport's quarterly report as materially accurate in all respects, these omissions were material.

**November 10, 2015**

122.   Freeport participated in the Cowen Global Metals & Mining Conference in New York City, on November 10, 2015. Adkerson presented at the conference on behalf of the Company. During the Conference, the Company discussed its ongoing activity in Indonesia and its efforts vis-à-vis the GOI to extend its COW.

123.   Adkerson, in pertinent part, stated as follows during the presentation in response to an analyst question:

> <Analyst>: Okay. Also on Indonesia, it's so difficult for us -- analysts and investors. While you guys are making progress over there, it seems like every day or every week, there's something that comes out of the media reports. And you have got an official being quoted who is with the Department of Mines and Energy, and you wonder where these statements are coming from. But if you could help us feel more comfortable with the tone – the tenor of your discussions that you're actually having with the government, distinguish that from what may be some of the noise out there, I think that would be very helpful.

> <Adkerson>: Well, Indonesia is a very interesting place. I -- we operated there as a Company since the early 1970s. I've been going there for 25 years. Our Chairman has been active there for longer than that. And it's a country that's gone through tremendous political and social changes over the years. We operate in Papua on the island of New Guinea, which has its own set of community issues. It's a very challenging place to operate. Our mine is at 13,000, 14,000 feet. Other than in El Nino times, it rains 200 to 400 inches a year there. We have 30,000-plus workers at that operation, and it's as technically challenging in terms of operations, environmental management, community relations as any place you can imagine.

56

As a country, Indonesia has changed dramatically during the time we have been there. Since President Suharto stepped down in 1998, Indonesia has emerged as a truly democratic company -- country. As a result of that, there's democratic voting on officials, and there is an active press. There's public opinion. And you add all that up, and there is a real element of nationalism about resources, which is not unique to Indonesia. It's shared around the world, but it's a political issue there.

Indonesia is a majority Muslim country, although the people there -- their Constitution provides for freedom of religion, and the people there are moderate in their views. Papua is a Christian area. And so you have just a lot of social, political issues going on. And this whole debate about resource nationalism is a real debate within their country, and it leads to the kinds of views being expressed which, in a free country, government officials and others are free to express those views.

*We have been working with the government actively for some time now, basically over the past three years, of getting approval for an extension of our contract beyond just primary term in 2021. And our contract gives us the right to that extension. But it requires government approval. The contract says the government cannot unreasonably delay or withhold that approval. But there's been views about trying to get us to convert to more of a licensing system where we would not have our contractual rights and would be subject to prevailing laws and regulations. We have resisted that. But we've been working with the government in a cooperative way to try to be responsive to certain of their aspirations in return for getting the extension approved with an adequate degree of legal and fiscal assurances going forward. And that's been the sticking point of getting that done.*

*In October, the mines minister, with the approval of the President, issued a letter in which was an important step, in which the government warranted that we would be granted the extension and, on terms consistent with our existing contract, subject to the revision of certain government regulations about the timing of when that could be granted.*

So we believe we are on the right track. It's important for us to work cooperatively with the government. The contract gives us rights. If the government fails to honor the contract, we have the rights to go to arbitration and claim damages for that. That would be not desirable from our standpoint or from the government standpoint. The potential damages could be enormous. And so we're trying to work with the government to allow us to continue to operate, to have the benefits of the access to the high-grade material that we can mine the next couple of years and to ultimately reach a

resolution that is acceptable to the people of Indonesia as well as our shareholders.

<Analyst>: Any sense as to when this process may finally be consummated? I know it's been painfully slow for you with all the twists and turns here, but it's moving the right direction. But is it something that likely could move into 2016 at this point, Richard?

<Adkerson>: Well, it could. We hope that it doesn't. We hope that the government carries through with its intentions of revising this regulation and move forward with it. But it's not something that we can predict with certainty.

124.    The statement featured above in Paragraph 123 was misleading because it omitted material information concerning the nature of the negotiations Freeport was having with the GOI. By November 10, 2015, the date of the above statement, Adkerson, Moffett, and Sjamsoeddin had already failed in their efforts to secure the extension for the COW. Further, contrary to Freeport's representation that the GOI had agreed or provided assurances with regard to the COW extension, Minister of Energy & Mineral Resources stated in no uncertain terms that the GOI had in fact not agreed to anything and that Freeport would have to comply with Indonesian regulations in their entirety. The above-statement failed to disclose an accurate description of Freeport's past negotiation efforts and the fact that these efforts had resulted in a negative outcome in terms of overall success given the GOI's firm position on compliance with Indonesian laws prohibiting negotiations of the COW prior to the two-year period before the COW expired. The above-statement also failed to provide any indication that Freeport's conduct with regard to the COW negotiations had already exposed the Company to the risk of harsh penalties under the FCPA and other applicable laws.

125.    The Company's description of its ongoing negotiations with the GOI differed materially from what was actually occurring. Had Quirk accurately disclosed the status of the Company's negotiations vis-à-vis the Indonesian government, investors would have been able to better evaluate the prospects of Freeport in Indonesia as well as the risk profile of

their investments. This information would have altered the total mix of information available to investors and, therefore, was material.

### Additional Class Period Statements

126.    Freeport maintained several public documents for investors in the corporate governance section of its website. These documents included a brochure titled "Principles of Business Conduct" and a copy of "Freeport's Anti-Corruption Policy." According to internet archives, the brochure and anti-corruption policy were available for public review from at least January 27, 2015 and up to and through the present date.[2]

127.    The brochure states, in pertinent part, as follows:

> Our reputation was built on the quality of our people and not through improper, unethical or questionable business practices. ***We abide by all international and local laws and regulations that forbid bribery of foreign officials and others, including the U.S. Foreign Corrupt Practices Act.***
>
> ***We do not offer or pay bribes, kickbacks, illegal gratuities or other similar payments to any person, organization or government official to secure improper advantages for our business. Likewise, we will not accept any bribe, kickback, illegal gratuity or similar payment. In addition, no payments, transfers or offers of Company funds, assets or anything of value shall be made that are not consistent with our policies and applicable laws, properly authorized according to our internal procedures, properly accounted for and clearly and accurately identified on the Company's books.*** If you are asked to make an improper payment or account for a transaction in an incorrect manner or become aware of any transaction that may involve an improper payment report it promptly to the designated Compliance officers.
>
> Keep in mind that payments can mean gifts, promises, authorization of gifts or offering anything of value on behalf of the Company to a government official or others. It also includes payments or gifts to a third party such as a consultant, contractor, partner, agent or supplier, who, in turn, is likely to

---

[2] The internet website "Wayback Machine" archives websites at various points in time. According to the "Wayback Machine," the referenced corporate policies were in existence and available for public review since at least January 27, 2015. The website is available at https://web.archive.org/web/20150127052439/http://www.fcx.com/sd/approach/policies.htm (last visited December 6, 2016).

make a gift, payment or offer anything of value to a government official or others.

The Company has adopted a comprehensive anti-corruption compliance program, which includes detailed policies and procedures regarding authorizations and recordkeeping for specific categories of transactions, including travel expenses, charitable contributions, gifts and entertainment, and other payments to foreign governments and government officials. Before you incur any of these types of expenses, please be sure to check our anti-corruption compliance policies, as well as local approval procedures.

Our Company discourages facilitating payments. Facilitating payments are payments made to help ensure that public officials perform non-discretionary tasks they are supposed to perform as part of their normal job function (such as visa processing, utility service and issuing routine licenses or permits to which you are clearly legally entitled). All facilitating payments must be reviewed and approved in accordance with Company policy and local procedures and must be properly recorded on the Company's books.

For additional information, please see our corporate Anti-Corruption Policy.

128.   Freeport's anti-corruption policy states, in pertinent part, as follows:

***The Company will compete for all business opportunities vigorously, fairly and legally and will negotiate contracts in a fair and open manner. Regardless of any pressure exerted by Government Officials, the Company will conduct business using only legal and ethical means.*** This practice of fairness and professionalism must extend to the activities of the Company's third parties, consortia and joint venture partners. Be careful to avoid situations involving these or any other types of third parties that might lead to a violation of the FCPA. Prior to entering into an agreement with any third party who may interact with the government on the Company's behalf, be certain to perform and document appropriate, risk-based FCPA-related due diligence. Obtain from the third party certain assurances of compliance. Due diligence on other business partners may also be required to ensure the Company is doing business with suitably qualified partners.

129.   Freeport's representations within its "Principles of Business Conduct" and "Freeport's Anti-Corruption Policy" were false and/or materially misleading. Contrary to the representation of strict compliance with anti-corruption and anti-bribery policies, Freeport's most senior employees were engaging in (and had been engaging in) a course of conduct

1  whereby they were attempting to secure an extension of the COW prematurely and through

2  illegal means.

3      130.   Separate and apart from Freeport's illicit efforts to secure the COW extension,

4  Freeport's employees (including Freeport Indonesia's employees) routinely engaged in

5  transactions with the GOI and persons and/or entities within Indonesia that violated the

6  FCPA and the Company's internal policies. These transactions provided benefits to the GOI

7  and Indonesian nationals through contracts that did not reasonably or fairly benefit Freeport.

8  The intent of these contracts was to benefit their recipients in a disguised manner so as to

9  avoid detection by the Company's auditors and/or authorities.

10      131.   By having these policies available for public review, Freeport provided false

11  assurance to investors that it complied with the FCPA and other applicable laws. This was

12  material to investors considering that Freeport had been accused of violating the FCPA on

13  numerous occasions in the past and was an issue of contention among the Company's

14  shareholders and federal regulators. The truth concerning Freeport's anti-corruption and anti-

15  bribery compliance would have been considered by investors when evaluating the

16  Company's operations and overall risk profile. Accordingly, this information would have

17  altered the total mix of information available to the public and, therefore, was material to

18  investors.

19  **E.**    **Recordings of Secret Meetings Expose Freeport's FCPA Violations**

20                                  **November 16, 2015**

21      132.   On November 16, 2015, the *Jakarta Globe* reported that Freeport Indonesia

22  agreed to cooperate with an impending investigation by the Indonesian House of

23  Representatives concerning allegations of bribery and extortion involving Novanto and

24  Freeport Indonesia.

25      133.   According to the article, Freeport Indonesia pledged its cooperation with the

26  inquiry over whether Novanto demanded shares of Freeport in exchange for support in early

27  contract negotiations with the Government of Indonesia.

28

134.    The article made reference to a complaint filed by Energy and Mineral Resources Minister Sudirman Said against an unnamed legislator, which included information obtained from wiretapped conversations purportedly showing that the legislator was seeking a 20% stake in Freeport Indonesia.

### November 19, 2015

135.    On November 19, 2015, the *Financial Times* reported the news initially reported by the *Jakarta Globe* just days earlier. On this information, Freeport's stock price declined from $8.77 per share on November 18, 2015 to $8.41 per share on November 19, 2015. Freeport's stock price continued to decline for the next two trading days, falling to $8.41 per share on November 19, 2015, $8.25 per share on November 20, 2015, and then to $8.00 per share on November 23, 2015 (following the weekend).

### November 25, 2015

136.    On November 25, 2015, *Tempo* Magazine, a weekly publication in Indonesia founded in or about 1971 and circulated in English since 2000, published an interview it held with Novanto.

137.    During the interview, *Tempo* Magazine asks Novanto why he felt he was being blackmailed. Novanto states that he "had no intention of asking for shares and no intention to use the President's name. . . . It was a joke but it became serious." The following is an excerpt of the interview:

> [Novanto:] When I met Maroef again, Riza cautioned me to be careful about Maroef. At the next meeting, Riza has a bad feeling about things because Maroef asked me something that was not right. It turned out to be right: He blackmailed me.

> [Tempo:] Why did you feel you were being blackmailed? Freeport just wanted its contract extended.

> [Novanto:] I was puzzled, too. I had no intention of asking for shares and no intention to use the President's name. My relationship with the President is good. I have good discussion with the ministers, too. It was a joke but it became serious. Apparently it was to entrap me.

AMENDED COMPLAINT
No. CV-00186-PHX-DJH

138.   The sum and substance of the interview suggested that Freeport was involved in and responsible for the accusations of illegal bribery. On this news, Freeport's stock declined from $8.30 per share on November 24, 2015 to $8.10 per share on November 25, 2016.

**November 26, 2015**

139.   On November 26, 2015, the *Indonesian Development Monitoring* blog reported that Indonesia's State-Owned Enterprise Workers Union intended to request that the Department of Justice investigate Freeport for potential violations of the FCPA. The State-Owned Enterprise Workers Union stated that Freeport violated the FCPA "by engaging in what we believe is likely . . . bribery of high-level government official and Chief of House Speaker in Indonesia to renew[] the Freeport mining contract."

**December 3, 2015**

140.   On December 3, 2015, Sjamsuddin testified before an Indonesian parliamentary committee. Sjamsuddin claimed that Novanto solicited bribes from Freeport. Sjamsuddin also claimed that he recorded the conversations he had with Novanto, which he then provided to Freeport before the Government of Indonesia.

141.   Sjamsuddin's testimony further indicted the Company as being involved with illicit and illegal conduct vis-à-vis the Government of Indonesia. On this news, Freeport's stock price declined from $7.83 per share on December 2, 2015 to $7.68 on December 3, 2015.

**December 28, 2015**

142.   On December 28, 2015, Moffett abruptly resigned from his position as Executive Chairman. Moffett's resignation occurred close in time to the revelations about Freeport's involvement in illegal bribery negotiations with the Government of Indonesia. Investors perceived Moffett's resignation as further evidence of Freeport's wrongdoing and potential illegal conduct.

143.    In response to Moffett's resignation, Freeport's stock price declined from $7.57 per share on December 24, 2015 to $6.85 per share on December 28, 2015 (the next trading day following the Christmas holiday and the weekend).

**January 18, 2016**

144.    According to a Reuters press release dated January 18, 2016, Freeport announced that Sjamsuddin had resigned as chief executive of Freeport Indonesia. The press release indicated that spokesperson Riza Pratama stated that, "He resigned, that's all I can say," and declined to give further details.

145.    On January 18, 2016, SeekingAlpha.com, a popular investor website, reported Sjamsuddin's resignation. The press release stated that Sjamsuddin had resigned for "personal reasons after leading the company for one year." The press release also noted that "Freeport Indonesia has been embroiled in a major political scandal after Maroef reported the [sic] government that a top political leader had attempted to extort the company."

146.    In an article dated January 20, 2016, *The Diplomat*, a news source for the Asian-Pacific region, confirmed the reports of Sjamsuddin's resignation. The article stated that Riza Pratama confirmed in an email to the *Jakarta Post* that, "It is correct that he has resigned" while declining to elaborate on the reasons for the resignation. The article continued, noting that Sjamsuddin's resignation followed "a tumultuous year for Freeport, which operates one of the world's largest copper and gold mines in Indonesia's far-eastern Papua region and has been in negotiations with the government to renegotiate the terms of its presence in the country." The article also noted that "Sjamsuddin himself had testified in hearings late last year following a major political scandal in which former House speaker Setya Novanto had allegedly demanded shares from Freeport in exchange for helping the company secure an extension of its contract due to expire in 2021." Finally, the article also made note of the fact that Sjamsuddin's resignation came "just weeks after Freeport's influential executive chairman and co-founder James R. Moffett stepped down." The article noted that "Moffet had long played a significant role in negotiations between the company

and the Indonesian government, with key relationships with senior officials and experience spanning decades."

147.    Similar to Moffett's resignation, Sjamsuddin's resignation occurred in the midst of the allegations of wrongdoing on the part of Freeport. Given the proximity between Sjamsuddin's resignation as well as Sjamsuddin's direct participation in the alleged wrongdoing, investors perceived Sjamsuddin's resignation as further confirmation that Freeport violated the FCPA and would likely be liable for breaking the law.

148.    In response to Sjamsuddin's resignation, Freeport's stock price declined from $4.35 per share on January 15, 2016, to $3.96 per share on January 19, 2016 (the next trading day following the weekend and Martin Luther King Day).

**F.    <u>Scienter</u>**

149.    Each of the Defendants at various times throughout the Class Period made statements which materially misled Plaintiff and other Freeport investors. While Defendants presented the public with statements and information tending to suggest that Freeport operated in strict compliance with anti-bribery and anti-corruption laws (including but not limited to the FCPA), the Company was in fact pursuing illegal negotiations in an effort to secure an extension of its COW with the GOI. Furthermore, Defendants presented their negotiations with the GOI as yielding positive results. In reality, the negotiations were failing. Defendants made these statements with scienter given the fact that they knew, or consciously disregarded with extreme recklessness, the truth about Freeport's illegal conduct in Indonesia.

<div align="center"><strong>Freeport Has a Long History of FCPA Violations</strong></div>

150.    Freeport's past dealings with the GOI strongly suggest that bribery was an integral part of Freeport Indonesia's operations. At one time or another over the past 30 years, Freeport has made illicit payments to military leaders, police forces, local businesses, and the political elite. Accusations of bribery and corruption are commonplace at Freeport. In each instance, Freeport was made aware of the accusation.

151.   In 2005, following an exposé by Global Witness Publishing about Freeport's practice of paying significant sums of money to military leaders, several New York City pension funds submitted a shareholder resolution asking Freeport to review its policy on paying the police and military. The funds argued that Freeport's practices violated the FCPA and could subject the Company and its shareholders to significant exposure. Freeport opposed the resolution.

152.   In 2006, the New York City comptroller accused Freeport of knowingly making "false or misleading" statements about payments to the Indonesian military, and asked the SEC and the U.S. Department of Justice to investigate. In separate letters to each agency, the comptroller, William C. Thompson Jr., who is the investment adviser to the city's five pension funds, said that he believed the Company might have violated the FCPA. Mr. Thompson's request came amid several other calls for investigations into Freeport's payments, including from Sen. Joseph R. Biden Jr., the ranking Democrat on the Foreign Relations Committee, who had long been concerned with corruption in the Indonesian military and its poor human rights record. Freeport denied wrongdoing.

153.   In 2010, Defendant Adkerson and several other Freeport employees were named as defendants in a whistleblower lawsuit filed under the Sarbanes-Oxley Act of 2002. The lawsuit accused Adkerson and the others of engaging in conduct that violated the FCPA. Specifically, the lawsuit alleged that Adkerson and several other Freeport employees sought to enter into contracts with Indonesian companies that bestowed no benefit upon Freeport in exchange for the consideration provided. One of the contracts at issue was with an entity owned by the Indonesian government. When the employee alerted his superiors of the potential wrongdoing, his employment was terminated.

154.   In 2011, the United Steelworkers union sent a letter to the U.S. Department of Justice requesting a foreign-bribery investigation into Freeport. In support of its request, the union cited reports from the Indonesian media. The union claimed that Freeport Indonesia had been making illegal payments to the Indonesian police constituting bribes. In pertinent part, the union wrote that, "The Indonesian police have recently been quoted in the

66

1  Indonesian media admitting that they accepted millions of dollars from [Freeport Indonesia]
2  to provide security for the miner's operations in Papua, Indonesia, and the National Police
3  Chief Gen. Timur Pradopo referred to the payments as 'lunch money' paid in addition to
4  state allocated security funding, stating 'It was operational funding given directly to the
5  police personnel to help them make ends meet.'" The union also cited particular examples of
6  where the Indonesian police were acting in the interests of Freeport over the Indonesian
7  people. Freeport again denied wrongdoing.

8       155.    Freeport's past conduct demonstrates a propensity to engage in illegal bribery
9  and corruption with the GOI. Freeport's past conduct is indicative of the Company's core
10 operations. Specifically, engaging in bribery and corruption was not an incidental policy or a
11 spontaneous or rogue act by a Freeport employee; instead, it was and is the deliberate policy
12 of Freeport itself with regard to conducting business in Indonesia. Freeport's commitment to
13 engage in past bribery and corruption is highly indicative of its scienter in the current action.

14             **Freeport Hired Sjamsoeddin to Engage in Back-Channel Negotiations**

15      156.    In furtherance of Freeport's manner of conducting business in Indonesia, the
16 Company hired Sjamsoeddin in order to take advantage of his political influence to increase
17 Freeport's chances of securing the COW extension. As previously alleged, Sjamsoeddin's
18 political connections extended throughout the GOI parliament providing access to the current
19 administration as well as the main opposition party.

20      157.    Freeport expected Sjamsoeddin to facilitate negotiations in furtherance of the
21 Company's efforts to obtain the COW extension. Articles discussing the hiring of
22 Sjamsoeddin noted the fact that Freeport Indonesia "implemented the change in its top
23 management while the company [was] at a crucial time in the drafting of an amendment to
24 its contract of work with the [GOI]."

25      158.    The hiring of Sjamsoeddin also came after Defendant Adkerson attempted to
26 secure the COW extension but failed. Adkerson traveled to Jakarta, Indonesia, twice in six
27 months during 2014. In his first visit in January, Adkerson met with four ministers in two
28 days—the Coordinating Minister of Economy Affairs Hatta Rajasa, Minster of Finance

Chatib Basri, Minister of Industry Mohamad Suleman Hidayat, and Minister of Energy & Mineral Resources Jero Wacik. Adkerson returned in June to meet with a new Coordinating Minister of Economy Affairs, Chairul Tanjung. Tanjung told Adkerson that the renegotiation of Freeport's COW could only start within two years of the COW's expiration. This meant that the decision on any extension of the COW would be made under the next government's authority.

159.    Even Defendant Moffett was unable to secure the COW extension. According to an interview with Luhut Panjaitan, GOI's former Coordinating Minister of Political, Legal & Security Affairs and current Coordinating Minister of Maritime Affairs, Moffett visited Panjaitan on three occasions. One visit was made while Panjaitan was serving on the Presidential Working Unit (similar to the Chief of Staff). During a different visit, Moffett brought United States Ambassador to Indonesia Robert O. Blake. Panjaitan refused to extend the COW outside of the two-year limitation set by Indonesian regulation.

160.    Accordingly, by hiring Sjamsoeddin, the Individual Defendants expected Sjamsoeddin to engage in the course of conduct that he did in order to secure the COW extension as quickly as possible and for the best price possible.

**Sjamsoeddin's Efforts to Extend the COW Violated the Law**

161.    Indonesian regulations in effect during the Class Period prohibited Freeport from negotiating extensions and/or contract modifications prior to two years before expiration of the contract. Government Regulation No. 77/2014 stated that holders of mineral contracts of work are allowed to request an extension of special mining permits no sooner than two years before their contracts expire. Accordingly, Freeport Indonesia was prohibited from negotiating the extension of the COW prior to 2019.

162.    Notwithstanding the applicable Indonesian regulations, Freeport and Sjamsoeddin engaged in a course of improper negotiations with members of the GOI parliament in an attempt to obtain the extension prematurely. Further, rather than contacting the GOI's Ministry of Energy and Minerals Resources, Sjamsoeddin attempted to secure the extension through House of Representatives Speaker Setya Novanto. Sjamsoeddin's efforts

68

to obtain the extension prematurely and through back channels supports the conclusion that Sjamsoeddin was aware he was violating applicable law.

163.   In addition to Indonesian law, Sjamsoeddin's conduct violated the FCPA. Specifically, Sjamsoeddin knowingly engaged in an illicit course of conduct whereby he attempted to bribe members of the GOI into approving an early extension of the Freeport's COW. As evidenced by the transcript of Sjamsoeddin's conversation with Novanto and Chalid, Freeport offered to build a power plant if and only if the GOI extended Freeport's COW. Sjamsoeddin, on behalf of Freeport, also offered to contribute an additional $700 million towards a smelter as well as shares in Freeport Indonesia upon the announcement of a commitment by the GOI to extend Freeport's COW.

164.   Sjamsoeddin's conduct vis-à-vis Novanto and the GOI constituted an offer or promise intended to cause a government official to take and action or make a decision that would benefit Freeport. Sjamsoeddin's conduct, accordingly, qualified as a violation of the FCPA. This violation is imputed to Freeport.

**Defendants Knew that Freeport Was Violating the FCPA**

165.   The Grasberg minerals district was of paramount importance to Freeport. It was responsible for virtually all of the Company's mined gold along with between 20% and 30% of the Company's mined copper. In fiscal 2015, Freeport mined 752 million pounds of copper and 1.23 million ounces of gold from its Indonesian operations. Freeport's proven and probable ore reserves within the Grasberg minerals district are vast—Freeport estimates recoverable and probable reserves of 28 billion pounds of copper and 26.8 million ounces of gold. Freeport anticipates that by 2021, the Company will have mined only 21% of the areas proven and probable recoverable ore. Freeport routinely acknowledges in its filings with the SEC that the "Grasberg minerals district is [Freeport's] most significant operating asset."

166.   Further underscoring the importance of the Grasberg minerals district is the fact that Freeport intended to invest significant sums of capital into its mining operations at the site. Freeport's current mining activity at the Grasberg site is largely above-ground. Freeport intends to transition these activities to below-ground mining for the purpose of

69

1    realizing significant additional resources. To accomplish the transition, Freeport anticipates

2    spending approximately $1 billion per year between 2016 and 2020.

3          167.   The importance of the Grasberg minerals district to Freeport frequently caused

4    it to be a topic of discussion during investor conference calls. Defendants Adkerson and

5    Quirk repeatedly referred to and discussed the importance of the Grasberg mine. For

6    example, during an investor conference call on April 23, 2015, Adkerson reported to

7    investors that the Company was "entering into the phases of the higher ore grades at

8    Grasberg as we approach completion of our mine plan to complete mining in the Open Pit. . .

9    . Looking forward through 2015, we have been working to get to the point now that we are

10    approaching for several years to be well-positioned to take advantage of what we will

11    achieve through completion of our expansion project, what we will achieve in Indonesia at

12    Grasberg as we enter into the final period of mining from the Open Pit."

13          168.   Similarly, during a presentation on May 12, 2015, Adkerson reiterated the

14    importance of Grasberg to Freeport, stating that "[Grasberg] is an ore body that's worth all

15    this effort we are putting into it. It's got very high grades of copper and gold that will extend

16    for a very long time in the future, giving us exactly what a mining company wants to have, a

17    world-class asset with ability to generate revenues and low costs."

18          169.   Quirk made similar comments about the Grasberg mine during a presentation

19    held on June 3, 2015, stating that "Grasberg . . . is a terrific mine that we've been operating

20    for many years now."

21          170.   On July 23, 2015, Adkerson again discussed the value of Grasberg, noting that

22    underground mining activities were likely to produce approximately 1.2 billion pounds of

23    copper and 1.5 million ounces of gold on an annual basis beginning in 2018.

24          171.   On October 22, 2015, Adkerson again discussed Grasberg in detail, stating that

25    it was a "major long-term project for [Freeport]."

26          172.   On November 10, 2015, Adkerson similarly touted the benefits of the

27    Company's Grasberg operations. In pertinent part, Adkerson stated that, "Most of you here,

28    I'm sure, are aware of our situation in Indonesia. But this is one of the world's great ore

AMENDED COMPLAINT
NO. CV-00186-PHX-DJH

1   bodies. It's incredible because it's got such high grades of copper and gold in the same ore,

2   and that's what makes it so valuable. Now, we are completing mining this ore body from the

3   open pit in 2017." Adkerson continued, discussing detailed operational plans for the

4   Company's Indonesian operations.

5       173.   The frequency with which Adkerson and Quirk discussed Indonesia, along

6   with the depth and detail of these discussions, demonstrate that Adkerson and Quirk were

7   intimately familiar with Freeport's operations in Indonesia and, in particular, the status of

8   Freeport's efforts to secure the COW extension.

9       174.   Defendant Moffett was also intimately familiar with the Company's operations

10  in Indonesia and efforts to secure the COW extension. Moffett is credited in large part for

11  Freeport's existence in Indonesia. Exploration under the guidance of Moffett discovered the

12  gold and copper deposits in Grasberg in 1988. Thereafter, he served as the "key connector"

13  between Freeport and Indonesian officials, according to analysts and news reports. More

14  than any other employee at Freeport, Moffett is responsible for maintaining Freeport's

15  position vis-à-vis the GOI. During numerous conference calls, Adkerson cited Moffett

16  directly as being the Company's chief asset in terms of securing the COW extension with the

17  GOI.

18      175.   Similarly, Defendant Whitmire signed the Company's quarterly reports, which

19  discussed the Company's operations in Indonesia at length. The fact that Whitmire signed

20  these reports shows that he had knowledge over the subject matter therein, including the

21  Company's efforts to secure the COW extension.

22      176.   With Indonesia at the forefront of Freeport's objectives, Defendants paid

23  special attention to the Company's and Sjamsoeddin's interactions with the GOI. Defendants

24  were aware of Sjamsoeddin's interactions with members of the GOI parliament and knew

25  that Sjamsoeddin was attempting to secure an extension to the COW prematurely and

26  contrary to law. Defendants knew, or consciously disregarded with extreme recklessness,

27  that Sjamsoeddin's interactions with the GOI violated United States law and Company

28  policies pertaining to anti-bribery and anti-corruption rules and restrictions.

AMENDED COMPLAINT
No. CV-00186-PHX-DJH

177.   The Individual Defendants knew at all relevant times the restrictions imposed by the FCPA. Freeport's "Principles of Business Conduct" detailed Company rules relating to corruption and bribery, stating that Freeport "abide[s] by all international and local laws and regulations that forbid bribery of foreign officials and others, including the U.S. Foreign Corrupt Practices Act." The "Principles of Business Conduct" stated further that Freeport "[does] not offer or pay any bribes, kickbacks, illegal gratuities or other similar payments to any person, organization or government official to secure improper advantages for our business. Likewise, we will not accept any bribe, kickback, illegal gratuity or similar payment." According to Freeport's "Principles of Business Conduct," "[s]elect employees (including certain managers, supervisors and other personnel)" were required to "certify their understanding of and compliance with the 'Principles of Business Conduct' on an annual basis." Furthermore, "[m]anagers and supervisors [were] additionally responsible for ensuring that the employees who report to them understand" the "Principles of Business Conduct."

178.   The "Principles of Business Conduct" referred employees to the Company's "Anti-Corruption Policy." The Company's "Anti-Corruption Policy" provided, in detail, the substance of the FCPA and required all employees to comply with it. In pertinent part, the "Anti-Corruption Policy" stated that "The FCPA in particular makes it illegal for U.S. citizens and companies, their officers, directors, employees and agents and any stockholders acting on their behalf, to bribe Government Officials." The "Anti-Corruption Policy" further stated that it applied to "[Freeport] and its subsidiaries, as well as to any joint [Freeport] venture or other business enterprise in which [Freeport] is a majority owner." The "Anti-Corruption Policy" stated explicitly that "This Policy extends to all of the Company's domestic and foreign operations, including operations conducted by any division, department, subsidiary, agent, consultant or other representative, as well as to the operations of any joint venture or other business enterprise outside the United States in which the Company is a majority owner." The "Anti-Corruption Policy" stated further that "The FCPA does not make an exception for cases where an official requests or solicits an improper

AMENDED COMPLAINT
NO. CV-00186-PHX-DJH

payment." Finally, the "Anti-Corruption Policy" required that "Everyone—employee, agent and other business partner—whose duties are likely to lead to involvement in or exposure to any of the areas covered by the FCPA and other applicable anti-corruption laws is expected to become familiar with and comply with this Policy and the Anti-Corruption Compliance Guidelines, as well as local policies and procedures. Periodic certifications of compliance will be required, as will participation in training sessions from time to time."

179. Between Freeport's "Principles of Business Conduct" and the Company's "Anti-Corruption Policy," the Individual Defendants were educated about the FCPA, agreed to comply with the FCPA, and certified their compliance with the FCPA while knowing that such certification was false.

### Adkerson and Quirk Signed False Certifications with the SEC

180. Adkerson and Quirk issued public certifications pursuant to the Sarbanes-Oxley Act of 2002 throughout the Class Period. These certifications represented to the public that the Company's disclosure controls were effective and that all statements in the Company's quarterly reports were materially accurate.

181. Exchange Act Rules 13a-15(e) and 15d-15(e) define "disclosure controls" as follows: "the term disclosure controls and procedures means controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the Act (15 U.S.C. 78a et seq.) is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure."

182. In order to accurately make these certifications, Adkerson and Quirk were required to evaluate the Company's disclosures and ensure the accuracy of the reports by

requiring their "personal stamp of approval." 149 Cong. Rec. S5325, S5329 (daily ed. Apr. 11, 2003). Provided that Adkerson and Quirk fulfilled their obligations under the Sarbanes-Oxley Act of 2002 and conducted a reasonable evaluation of the Company's disclosure controls, they knew that the Company's public reports failed to provide investors with materially accurate information about Freeport's Indonesian operations and compliance with the FCPA.

183.   Given the fact that Adkerson and Quirk signed their respective certifications despite the fact that Freeport's reports did not contain materially accurate information required to be disclosed, Akerson and Quirk either intentionally lied or recklessly disregarded the risk of misleading investors when they signed their certifications. Adkerson's and Quirk's false certifications raise the inference that they acted with scienter.

**Moffett's and Sjamsoeddin's Resignations Further the Inference of Scienter**

184.   Moffett was Freeport's founder, former CEO, and longtime Chairman. He was integral to Freeport's operations in Indonesia. Further, as stated by Adkerson during the Class Period, Moffett was engaged in active discussions with GOI officials in an attempt to secure the COW extension.

185.   Moffett's resignation occurred abruptly without any explanation. The fact that his resignation occurred so close in time to the revelations concerning the Company's illegal conduct vis-à-vis the GOI strongly supports the conclusion that Moffett was asked to resign in connection with his wrongdoing. Moffett's resignation, for this reason, further supports the conclusion that he and the other Defendants acted with scienter.

186.   Sjamsoeddin's resignation also implicates Defendant as having acted with scienter. Freeport Indonesia hired Sjamsoeddin in January 2015 to secure the extension of the COW. Approximately one year later, Sjamsoeddin abruptly resigned amidst the scandal concerning Freeport's illegal negotiations with the GOI. Sjamsoeddin's resignation came just weeks after news surfaced about his improper meetings with Novanto. Freeport did not make any conciliatory statements concerning Sjamsoeddin's resignation. Freeport further declined

to provide investors with any of the routine explanations about the resignation such as that it was for reasons not being related to disagreements with management or company operations.

187.   The timing and circumstances of Sjamsoeddin's resignation strongly suggest that Freeport terminated Sjamsoeddin's employment over his conduct. The fact that Sjamsoeddin was effectively terminated for cause shows that wrongdoing occurred. Sjamsoeddin's resignation further supports a showing of scienter on the part of Freeport, if not all of the Individual Defendants.

### Freeport's Past Dealings with the GOI Evidence Corporate Scienter

188.   Freeport's propensity to engage in bribery and corruption is evidence that the Company is routinely directed by high-level employees, if not the Company's executive officers themselves, to violate the law.

189.   Regardless of whether the Individual Defendants directed Freeport to engage in illegal conduct, the Company still attempted to obtain the extension of the COW through illegal means and, while doing so, made materially misleading statements about its operations.

190.   Freeport engaged in this course of action due to direction from high-level employees at the Company. The employees that directed Freeport to engage in wrongful conduct did so with scienter and, as a result, their scienter is imputed to the Company.

191.   The scienter of the Adkerson, Quirk, Whitmire, and other Freeport employees responsible for Freeport's illegal conduct is imputed to the Company under the doctrine of respondeat superior and common law principles of agency.

### Defendants' Fraud Enabled the Company to Raise Proceeds of $1 Billion

192.   During third-quarter of fiscal 2015, Freeport sold 97.5 million shares of common stock under the Company's equity programs, which generated gross proceeds of $1.0 billion. From October 1, 2015 to November 5, 2015, Freeport sold an additional 34.1 million shares of common stock, generating gross proceeds of $0.4 billion. In total, Freeport raised $1.4 billion of gross proceeds under the Company's $2 billion of "at-the-market" equity programs.

193.   According to Freeport's quarterly report (Form 10-Q) for the third quarter of fiscal 2015, Freeport intended to use the net proceeds for general corporate purposes, which would include the repayment of amounts outstanding under its revolving credit facility and other borrowings as well as the financing of working capital and capital expenditures.

194.   By engaging in the fraud described above, Freeport able to generate these funds with success. Had Defendants disclosed the truth to investors about the Company's fraudulent operations, investors would not have been willing to pay as much (if anything at all) for the Company's shares. As a result of Defendants' fraud, Freeport benefited financially.

*          *          *

195.   As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued or disseminated in the name of the Company or in their own name during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Freeport, their control over and/or receipt and/or modification of Freeport's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Freeport, were active and culpable participants in the fraudulent scheme alleged herein.

196.   Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including each of the Defendants.

197.    Defendants, because of their positions with Freeport, controlled the contents of the Company's public statements during the Class Period. Defendants were provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations that were being made were false and misleading. As a result, each of the Defendants is responsible for the accuracy of Freeport's corporate statements and is therefore responsible and liable for the misrepresentations contained therein.

## G.    **Loss Causation**

198.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Freeport shares and operated as a fraud or deceit on Class Period purchasers of Freeport shares by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Freeport shares fell precipitously as the prior artificial inflation dissipated. As a result of their purchases of Freeport shares during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

199.    By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Freeport's business and prospects. Defendants' false and misleading statements and omissions had the intended effect and caused Freeport shares to trade at artificially inflated levels throughout the Class Period, reaching as high as $23.50 per share on May 1, 2015, before falling to $3.74 per share on January 13, 2016 – a decline of 84%.

200.    Defendants' misrepresentations, omissions, and fraudulent conduct concealed the fact that Defendants were engaging in illegal conduct vis-à-vis the GOI and that the

Company's negotiations with the GOI were failing. Freeport's public statements during the Class Period did not disclose that the Company was vulnerable to negative consequences arising from this illegal conduct under the FCPA or that the Company's efforts to secure the COW extension were in fact far less successful than represented (negative, in fact). As alleged above, however, the risks posed by this illegal conduct and the Company's overall failure in terms of negotiations ultimately materialized and resulted in damage to Plaintiff and other Class Members. The materialization of these risks is evidenced by the fact that the truth ultimately came to light and caused a decline in the price of Freeport's shares.

201.   The precipitous decline in the price of Freeport shares was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the decline in the price of Freeport shares negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Freeport shares and the subsequent significant decline in the value of Freeport shares when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## NO SAFE HARBOR

202.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein misrepresented Freeport's compliance with the FCPA during the Class Period and, therefore, relate to then-existing facts and conditions. In addition, as the false and/or materially misleading statements were known to be false at the time they were made, they were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

203.   To the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Freeport who knew that the statement was false when made.

## FRAUD-ON-THE-MARKET DOCTRINE

204.   Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

    (a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

    (b)    the omissions and misrepresentations were material;

    (c)    the Company's stock traded in an efficient market;

    (d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

    (e)    Plaintiff and the other members of the Class purchased Freeport common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

205.   At all relevant times, the market for Freeport common stock was an efficient market for the following reasons, among others:

    (a)    Freeport common stock met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

    (b)    as a regulated issuer, Freeport filed periodic public reports with the SEC and the NYSE;

    (c)    Freeport regularly communicated with public investors via established market communication mechanisms, including through regular

79

disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   Freeport was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

206.   As a result of the foregoing, the market for Freeport common stock promptly digested current information regarding Freeport from all publicly available sources and reflected such information in the prices of Freeport common stock. Under these circumstances, all purchasers of Freeport common stock during the Class Period suffered similar injury through their purchase of Freeport common stock at artificially inflated prices and a presumption of reliance applies.

207.   A class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Freeport's compliance with the FCPA and their negotiations with the GOI – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

208.   Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here, and, therefore, *Affiliated Ute* provides a separate, distinct basis for finding the applicability of a presumption of reliance.

## CLASS ACTION ALLEGATIONS

209.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or acquired Freeport

80

common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of Freeport, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

210.   The members of the Class are so numerous that joinder of all members is impracticable, since Freeport has millions of shares of stock outstanding and because Freeport's shares were actively traded on the NYSE. As of February 19, 2016, Freeport had more than 1.2 billion shares issued and outstanding. While the exact number of Class members in unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class and that they are geographically dispersed.

211.   There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members, including:

(a)   whether the Act was violated by Defendants;

(b)    whether Defendants omitted and/or misrepresented material facts in their publicly disseminated reports, press releases, and statements during the Class Period;

(c)   whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)   whether Defendants participated and pursued the fraudulent scheme or course of business complained of herein;

(e)   whether Defendants acted willfully, with knowledge or recklessly in omitting and/or misrepresenting material facts;

(f)   whether the price of Freeport securities was artificially inflated during the Class Period as a result of the material nondisclosures and/or misrepresentations complained of herein; and

81

(g)     whether the members of the Class have sustained damages as a result of the decrease in value of Freeport's stock when the truth was revealed, and if so, what is the appropriate measure of damages.

212.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct in a substantially identical manner.

213.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

214.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### Count I

### Violation of Section 10(b) of the Act and SEC Rule 10b-5 against Defendants

215.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

216.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

217.    Defendants violated §10(b) of the 1934 Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5], in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Freeport's common stockholders during the Class Period.

AMENDED COMPLAINT
No. CV-00186-PHX-DJH

218.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased Freeport's common stock at artificially inflated prices. Plaintiff and the Class would not have purchased Freeport's common stock at the prices they did, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and/or omissions.

219.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Freeport common stock during the Class Period.

## Count II

### Violation of Section 20(a) of the Act against the Individual Defendants

220.    Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

221.    The Individual Defendants acted as controlling persons of Freeport within the meaning of §20(a) of the Act, as alleged herein. By reason of their high-level positions with Freeport, their ownership of Freeport common stock, their participation in and/or awareness of Freeport's operations and/or intimate knowledge of the false and materially misleading statements filed by Freeport with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control (and did influence and control), directly or indirectly, the decision-making of Freeport, and caused Freeport to engage in the wrongful conduct complained of herein, including the dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had access to: Freeport's reports, press releases, public filings and other information and statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Freeport and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

222.   As set forth above, Defendants violated §10(b) of the Act and SEC Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. Moreover, by virtue of their positions as controlling persons, the Individual Defendants had the power and authority to, and did, cause Freeport to engage in the wrongful conduct alleged.

223.   As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their sales of Freeport's common stock during the Class Period. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(A)   Determining this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiff as Class representatives, and designating Lead Counsel as Class Counsel;

(B)   Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with interest thereon;

(C)   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(D)   Awarding such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury.

[Signature block on following page]

Dated:  December 6, 2016                    LEVI & KORSINSKY, LLP


                                           By:  s/ Adam M. Apton
                                               Adam M. Apton

                                           NICHOLAS I. PORRITT
                                           ADAM M. APTON
                                           1101 30th Street N.W., Suite 115
                                           Washington, D.C. 20007
                                           Tel: (202) 524-4290
                                           Fax: (202) 333-2121

                                           *Attorneys for Lead Plaintiff*
                                           *and Lead Counsel for Class*

**CERTIFICATE OF SERVICE**

I, Adam M. Apton, hereby certify that on December 6, 2015, I electronically filed the foregoing complaint with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the registered participants as identified on the Notice of Electronic Filing.

s/ Adam M. Apton
Adam M. Apton