IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Dean Magro, et al.,<br><br>        Plaintiffs,<br><br>v.<br><br>Freeport-McMoran Incorporated, et al.,<br><br>        Defendants. | No. CV-16-00186-PHX-DJH<br><br>**ORDER** |

Pending before the Court is a Motion to Dismiss (the "Motion") (Doc. 60) filed by Defendants Freeport-McMoRan Inc. ("Freeport"), Richard Adkerson, Kathleen Quirk, C. Donald Whitmire, and James Moffett (collectively "Defendants"). The Motion seeks to dismiss Plaintiffs' First Amended Complaint ("FAC"). (Doc. 51). Plaintiffs filed a Response (Doc. 68), and Defendants filed a Reply. (Doc. 69).[1]

**I. Background**

Plaintiffs, purchasers of Freeport common stock, initiated this federal securities class action on January 26, 2016. (Doc. 1). Freeport is an international mining company. (Doc. 51 at ¶ 1). After amending the first Complaint, Plaintiffs filed their 87-page FAC alleging that Freeport and its corporate officers conducted an illegal lobbying campaign in Indonesia aimed at extending its contract with the government to conduct mining operations in the country. (*Id.* at ¶¶ 1, 2). The contract, or Contract of Work ("COW") as

---

[1] Defendants requested oral argument on this matter. The Court denies the request because the issues have been fully briefed and oral argument will not aid the Court's decision. *See* Fed. R. Civ. P. 78(b) (court may decide motions without oral hearings); LRCiv 7.2(f) (same).

the FAC calls it, is set to expire in 2021 but can be extended to 2041. (*Id.* at ¶ 2). Plaintiffs assert that "Indonesian regulations prohibited Freeport from negotiating the COW (or the terms of its extensions) prior to two years before the COW's expiration (*i.e.*, Freeport was not allowed to negotiate the terms of its extension prior to 2019)." (*Id.*) The FAC alleges that despite this regulation, Defendants engaged in negotiations with the Indonesian government aimed at securing the COW's extension. (*Id.* at ¶ 4). In doing so, Plaintiffs allege that Defendants violated the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1, *et seq.* (the "FCPA"), Indonesian law, and Freeport's internal policies against bribery and corruption. (*Id.* at ¶ 5).

The key event detailed in the FAC is a meeting in June of 2015 between the President of the Freeport subsidiary PT Freeport Indonesia ("Freeport Indonesia"), Maroef Sjamsoeddin ("Sjamsoeddin"), and Speaker of the Indonesian House of Representatives, Setya Novanto ("Novanto"). (*Id.* at ¶¶ 5, 56). The FAC alleges that Sjamsoeddin attempted to bribe Novanto by offering shares of Freeport Indonesia "as well as interests in lucrative business opportunities" in exchange for his support in extending the COW. (*Id.* at ¶ 5). In addition, the FAC alleges that "Defendants expected Sjamsoeddin to engage in the course of conduct that he did in order to secure the COW extension as quickly as possible and for the best price possible." (*Id.* at ¶ 160).

The FAC further alleges that throughout 2015 Defendants made various representations that they were engaged in active discussions to extend the COW (*Id.* at ¶ 60), that the discussions were going well (*Id.* at ¶ 94), and that Defendants were abiding by all laws and regulations forbidding bribery in accordance with the FCPA. (*Id.* at ¶ 127).

In November of 2015, some Indonesian media outlets published articles relaying that "Freeport Indonesia agreed to cooperate with an impending investigation by the Indonesian House of Representatives concerning allegations of bribery and extortion involving Novanto and Freeport Indonesia." (*Id.* at ¶ 132). The FAC details a decline in Freeport's stock price, starting on November 18, 2015 at $8.77 per share. (*Id.* at ¶ 135). On December 28, 2015, Defendant Moffett then resigned as Freeport's Chairman of the

Board (*Id.* at ¶ 142), and on January 18, 2016, a *Reuters* press release announced Sjamsoeddin's resignation from Freeport Indonesia. (*Id.* at ¶ 144). By January 19, 2015, Freeport's stock price had dropped to $3.96 per share. (*Id.* at ¶ 148). Plaintiffs argue that this decline came as a result of "Defendants' fraud finally being revealed to investors and the market" (*Id.* at ¶ 201), and that Freeport raised around $1.4 billion in gross proceeds from stock sales during that period. (*Id.* at ¶ 192).

Count One of the FAC alleges that Freeport defrauded investors and violated section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b) ("section 10(b)"), and Securities and Exchange Commission (SEC) Rule 10b-5, 17 C.F.R. § 240.10b–5 ("Rule 10b-5"). (*Id.* at ¶¶ 216-17). Count Two cites the "Individual Defendants" as the controlling persons within Freeport who violated section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) ("section 20(a)"). (*Id.* at ¶ 223). The fraud alleged in the FAC is predicated upon Defendants' representations of the COW negotiation's status (*Id.* at ¶ 124), and representations that they were not violating the FCPA or Indonesian law. (*Id.*) Plaintiffs argue that had Defendants accurately represented Freeport's activities in Indonesia, "investors would have been able to better evaluate the prospects of Freeport in Indonesia as well as the risk profile of their investments." (*Id.* at ¶ 125).

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants move to dismiss the FAC for failure to state a claim upon which relief can be granted. (Doc. 60 at 7). The Motion argues that FAC's pleadings "do not satisfy the heightened pleadings standards for securities fraud class actions established by Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995." (*Id.*)

. . . .
. . . .
. . . .
. . . .
. . . .
. . . .
. . . .

## II. Discussion

### A.     Legal Standard for Rule 12(b)(6) Motion

A motion to dismiss pursuant to Rule 12(b)(6) challenges the legal sufficiency of a complaint. *Cook v. Brewer*, 637 F.3d 1002, 1004 (9th Cir. 2011). Complaints must contain a "short and plain statement showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). This requires "more than an unadorned, the-defendant-unlawfully-harmed me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556) (internal quotation marks and citation omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that defendant has acted unlawfully." *Id.* (citation omitted).

In addition, "claims brought under Rule 10b–5 and section 10(b) must meet the particularity requirements of Federal Rule of Civil Procedure 9(b)." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005); *see also* Fed. R. Civ. P. 9(b) (requiring that allegations of fraud or mistake "state with particularity the circumstances constituting fraud or mistake"). Congress enacted further pleading requirements with the Private Securities Litigation Reform Act ("PSLRA"), Pub. L. No. 104-67 (1995), under which "any private securities complaint alleging that the defendant made a false or misleading statement must: (1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' 15 U.S.C. § 78u–4(b)(1); and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' § 78u–4(b)(2)." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007).

The Court must interpret facts alleged in the complaint in the light most favorable to the plaintiff, while also accepting all well-pleaded factual allegations as true. *Shwarz v.*

- 4 -

*United States*, 234 F.3d 428, 435 (9th Cir. 2000). That rule does not apply, however, to legal conclusions. *Iqbal*, 556 U.S. at 678. A complaint that provides "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Nor will a complaint suffice if it presents nothing more than "naked assertions" without "further factual enhancement." *Id.* at 557.

**B.     Analysis**

To prevail on a claim of section 10(b) and Rule 10b–5 violations, a plaintiff must show: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)). Defendants' Motion argues that the FAC fails to plead three of these elements. (Doc. 60 at 7-8). First, Defendants argue the FAC fails to show a material representation or omission. (*Id.* at 10). Second, Defendants argue that the facts alleged in the FAC do not give rise to a strong inference that Defendants knew their statements about FCPA compliance and the status of the COW extension discussions were misleading. (*Id.* at 20). Finally, Defendants argue that the FAC fails to demonstrate loss causation either through the alleged reveal of illegal activity or the status of the COW extension discussions. (*Id.* at 23, 29).

For the following reasons, the Court will grant Defendants' Motion. (Doc. 60).

*1. Material Misrepresentation*

To sufficiently plead a material misrepresentation in a securities fraud action, the complaint must "specify each statement to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); *see also Tellabs, Inc.*, 551 U.S. at 321. The fraud alleged in the FAC can be attributed to two general representations: Defendants misrepresented that they were abiding by Indonesian law and the FCPA when

- 5 -

really "the COW negotiations had already exposed the Company to the risk of harsh penalties under the FCPA and applicable laws" (Doc. 51 at ¶ 124); and, Defendants represented to investors that their negotiations to extend the COW were going well, when they were actually encountering difficulties. (*Id.*)

Defendants' Motion first argues that the FAC fails to establish a material misrepresentation because Defendants never violated the Indonesian regulation regarding the COW negotiations, and could not have done so because the regulation does not even apply to Freeport. (Doc. 60 at 26). To underscore this point, Defendants note that "[n]o governmental authority has ever found that Freeport violated the FCPA or even accused it of doing so." (*Id.* at 8). Defendants also argue that the representations alleged in the FAC concerning the status of the COW extension negotiations are inactionable because they fall under the PSLRA's safe harbor provision. (*Id.* at 27). Finally, Defendants argue that Freeport's FCPA policy is a corporate code of conduct and its violation cannot serve as the basis for securities fraud. (*Id.* at 14).

To begin, nowhere in their Response do Plaintiffs address the question of whether the Indonesian regulation applies to Freeport or whether it was actually violated. Defendants' Reply correctly notes this omission. (Doc. 69 at 24). Plaintiffs, instead, simply reassert that Defendants violated Indonesian law and the FCPA. *See* (Doc. 68 at 25) ("Given that Plaintiff's well-pleaded allegations are to be accepted as true at the pleading stage, Freeport violated the FCPA regardless of whether Defendants agree."). Plaintiffs are mistaken; the Court must accept *factual* allegations as true. *See Shwarz*, 234 F.3d at 435. "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

Accordingly, the question before the Court is whether the FAC's factual allegations adequately specify the reasons why Defendants' statements of its compliance with Indonesian law were misleading. *See* 15 U.S.C. § 78u-4(b)(1). Plaintiffs have clearly alleged that Defendants violated Indonesian regulations in the COW negotiations, but they have not specified how the regulation applies to Defendants or why their particular actions violate the regulation. *See id.*; *Iqbal*, 556 U.S. at 678. The closest Plaintiffs get to

- 6 -

showing why Defendants violated the regulation is when they explain that "Government Regulation No. 77/2014 stated that holders of mineral contracts of work are allowed to request an extension of special mining permits no sooner than two years before their contracts expire." (Doc. 51 at ¶ 161). But the FAC, as Defendants correctly note, does not show that Defendants held "special mining permits" or that their negotiations about the terms of an extension constituted a "request" for extension. (Doc. 60 at 26).[2] This makes it difficult to see the plausible relevance of the alleged regulatory violations, especially when the FAC later alleges that Defendants freely and publicly acknowledges that they were engaged in negotiations with the Indonesian government. (Doc. 51 at ¶ 123). S*ee also Twombly*, 550 U.S. at 570. The FAC, therefore, does not show that Defendants violated Indonesian regulations by negotiating the COW's extension before 2019.

In addition, Plaintiffs have not pled sufficient facts to plausibly claim that Sjamsoeddin, while acting as President of Freeport Indonesia, attempted to bribe Indonesian officials in violation of Indonesian law or the FCPA. Defendants assert that "the pleaded facts show that Sjamsoeddin never bribed anyone, but was rather solicited by others to pay a bribe and then promptly reported their conduct to the Indonesian government." (Doc. 60 at 8). Indeed, the events detailed in the FAC do not support Plaintiffs' allegations. For example, the articles cited in the FAC make clear that Freeport Indonesia "pledged its cooperation with the inquiry over whether Novanto demanded shares of Freeport in exchange for support in early contact negotiations with the Government of Indonesia." (Doc. 51 at ¶ 133). Sjamsoeddin himself cooperated with an Indonesian investigation into the bribery allegations by providing a recording of his conversations with Novanto and testifying before an Indonesian parliamentary committee. (*Id.* at ¶ 139). While the FAC notes that Novanto is still politically active (*id.* at ¶ 57), it never discusses whether Sjamsoeddin or any Defendants were found to have

---

[2] Upon review of the English translation of the Indonesian regulation provided by Defendants (Doc. 60-2 at 66), it is certainly not clear how, if at all, this regulation applies to Freeport's COW extension negotiations. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (stating that courts may "consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment").

committed any wrongdoing in the course of the Indonesian government's investigation. This omission leaves open a possibility that Sjamsoeddin really did initiate the bribe, but a complaint must demonstrate more than the sheer possibility that the alleged crime occurred. *See Iqbal*, 556 U.S. at 678. Accordingly, even when these facts are viewed in the light most favorable to Plaintiffs, the FAC fails to bring a plausible claim that Sjamsoeddin attempted to conduct a bribery scheme. *See Shwarz*, 234 F.3d at 435.

Second, the FAC spends many pages quoting whole paragraphs of Defendants' statements, and Plaintiffs bold certain sentences to support their argument that the status of the COW negotiation was misrepresented.[3] (Doc. 51 at ¶ 85) (quoting Defendant Adkerson when he says he is "confident" Freeport will succeed in its negotiations); (*Id.* at ¶ 94) (quoting Defendant Moffett's statement that "we're making good progress on extending our export license"); (*Id.* at ¶ 97) (quoting Defendant Moffett who, when asked if he expects to reach an agreement on the COW extension in the "next couple of days," says "[t]hat's exactly right"). Defendants argue their statements about the status of the COW negotiations "are protected by the PSLRA's safe harbor for forward-looking statements and are therefore inactionable as a matter of law." (Doc. 60 at 27). Plaintiffs argue the safe harbor provision is not applicable because they base their claims on "Defendants' descriptions of the past and then-present state of affairs." (Doc. 68 at 19 n.2).

The PSLRA allows a company's forward-looking statements to serve as a basis for fraud unless the statements are identified as such by the speaker. *See* 15 U.S.C. § 78u-5(c). In addition, vague and optimistic statements made by corporate officials are not actionable because they can be characterized as puffery. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016); *see also In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) (noting that a "mildly optimistic, subjective assessment" of a present state of affairs does not give rise to a securities violation).

. . . .

---

[3] The Court will note that this method of presenting facts is far from particularized. *See* Fed. R. Civ. P. 9(b).

- 8 -

Initially, the Court notes that Defendants provided copies of two of the presentations (Doc. 60-2 at 97, 139) in which the FAC asserts Defendants made material misrepresentations. (Doc. 51 at ¶¶ 72, 84). *See Ritchie*, 342 F.3d at 908. Both are accompanied by "Cautionary Statement[s]" warning that results of their forward-looking statements may differ materially from their projections. (Doc. 60-2 at 98, 140). These certainly qualify as a "meaningful cautionary statement" under the PSLRA's safe harbor provision. 15 U.S.C. § 78u-5(c)(1)(A)(i). But even assuming the inapplicability of the safe harbor provision, Defendants' statements relating to the COW negotiation, *e.g.* "we're making good progress" (Doc. 51 at ¶ 94), easily fall under the category of puffery. *See Lloyd*, 811 F.3d at 1207. Without anything more, Defendants' statements concerning the status of the COW negotiations are not actionable as a matter of law. *See id.*

Third, Defendants argue that statements made in Freeport's Anti-Corruption Policy and Principles of Business Conduct Policy are not actionable because, as corporate codes of conduct, they are "transparently aspirational" and cannot serve as the basis for an action for fraud. (Doc. 60 at 14) (quoting *Retail Wholesale & Dep't Store Union Local 338 v. Hewlett-Packard Co.*, 845 F.3d 1268, 1278 (9th Cir. 2017)). As the Ninth Circuit has said, the "promotion of ethical conduct" cannot reasonably suggest that a company's internal policies will not be violated. *Retail Wholesale*, 845 F.3d at 1278. The Court agrees. The statements made in Freeport's Anti-Corruption Policy and Principles of Business Conduct Policy (Doc. 51 at ¶¶ 126-31) are also not actionable as a matter of law. *See Retail Wholesale*, 845 F.3d at 1278.

In sum, the Court finds that the FAC's claims predicated upon violations of Indonesia's COW extension regulations or attempted bribery in violation of the FCPA fail to demonstrate a material misrepresentation. In addition, statements about the status of the COW discussions and statements made in Freeport's Anti-Corruption Policy and Principles of Business Conduct Policy are not actionable.

*2. Scienter*

To sufficiently plead a violation of section 10(b) and Rule 10b–5, a plaintiff's allegations must create a strong inference that defendants acted intentionally or with

deliberate recklessness. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 992 (9th Cir. 2009). This requires that the complaint, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). In reviewing a complaint during a motion to dismiss, a court asks "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc.*, 551 U.S. at 310 (emphasis original). "A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco*, 552 F.3d at 991 (citing *Tellabs, Inc.*, 552 U.S. at 323-34).

The FAC alleges that Defendant Moffett's and Sjamsoeddin's resignations support the conclusion that Defendants acted with the requisite scienter because both came "close in time to the revelations concerning the Company's illegal conduct." (Doc. 51 at ¶¶ 184-87). As to the other Defendants, the FAC asserts that their knowledge of Freeport's Indonesian operations shows they were "intimately familiar" with the efforts to secure the COW extension. (*Id.* at ¶¶ 173-74). Because of this familiarity, the FAC asserts that Defendants hired Sjamsoeddin with the expectation that he would engage in bribery to secure the COW's extension. (*Id.* at ¶ 160). To provide context and to support Plaintiffs' inference of scienter, the FAC contains an account of Freeport's activities in Indonesia (*Id.* at ¶¶ 31-44), which they claim "strongly suggests that bribery was an integral part of Freeport Indonesia's operations." (*Id.* at ¶ 150). The allegations, Defendants' Motion argues, "do not give rise to a 'strong,' 'cogent,' or 'compelling' inference that any individual defendant knew about any of the alleged FCPA violations." (Doc. 60 at 20) (referencing *Zucco*, 552 F.3d at 991).

To begin, an employee's resignation supports an inference of scienter when "the resignation at issue was uncharacteristic when compared to the defendant's typical hiring and termination patterns or was accompanied by suspicious circumstances." *Zucco*, 552 F.3d at 1002. In either case, "a plaintiff must allege sufficient information to differentiate

between a suspicious change in personnel and a benign one." *Id.* Defendants' Motion argues that Defendant Moffett's and Sjamsoeddin's resignations do not establish scienter related to misrepresentations of Freeport's FCPA compliance or the COW negotiation's status. (Doc. 60 at 21, 29 n.14). Plaintiffs' Response does not discuss Freeport's employment practices, but it does assert that the resignations occurred during the "scandal revelations" such that the "surrounding circumstances . . . support an inference of intentional wrongdoing." (Doc. 68 at 33).

While the resignations and news stories occurred closely in time, the circumstances, as told in the FAC, are not suspicious enough to establish scienter. In *Zucco*, a company publicly announced that it had made a significant accounting error that, if undetected, would appear to bolster the company's financial condition. 552 F.3d at 988. Plaintiff investor claimed that the chief financial officer's retirement just before the announcement demonstrated the officer's scienter with regard to the accounting issue. *Id.* at 1001. The Ninth Circuit noted that, "[t]he complaint does not indicate whether [the officer] was nearing retirement age, whether he left to pursue other opportunities, or even the length of his tenure. Thus the bare fact of [the officer's] retirement cannot support [plaintiff's] allegations of scienter." *Id.* at 1002; *see also City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 622 (9th Cir. 2017) (holding an employee's resignation that coincided of with a company's public corrections of prior statements is not enough to establish scienter).

The FAC does not mention whether Defendant Moffett or Sjamsoeddin were near retirement age or what the length of their tenure was, nor does it present any kind of contemporaneous announcement from Freeport correcting past statements. *See Zucco*, 522 F.3d at 988, 1002. And as discussed above, it appears that Novanto, not Sjamsoeddin, was the one who attempted to solicit a bribe. Even when the FAC quotes news articles on the resignation, it ends up supporting the view that Novanto tried to initiate a bribe. (Doc. 51 at ¶ 145) ("Freeport Indonesia has been embroiled in a major political scandal after Maroef [Sjamsoeddin] reported [sic] the government that a top political leader had attempted to extort the company."); (*Id.* at ¶ 146) ("Sjamsuddin [sic]

himself had testified in hearings late last year following a major political scandal in which former House speaker Setya Novanto had allegedly demanded shares from Freeport in exchange for helping the company secure an extension of its contract due to expire in 2021."). The fact that the resignations occurred around the same time as the publication of these articles does not sufficiently demonstrate why the circumstances surrounding the resignations are suspicious, and as such, Plaintiffs' claims amounts to "conclusory allegations" that, "without more, cannot support a strong inference of scienter." *Zucco*, 552 F.3d at 1002.

Defendants' Motion also argues that general knowledge of Freeport's Indonesian operations does not establish scienter. (Doc. 60 at 20) (citing *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008)). In their Response, Plaintiffs argue that Defendants were so involved in Freeport's Indonesian operations that it would be absurd to suggest that they were unaware of the illicit means used in the COW negotiations. (Doc. 68 at 31) (citing *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008)). From this, Plaintiffs conclude that Defendants, especially Adkerson and Moffett, were directly responsible for initiating and monitoring a "bribery scheme." (*Id.* at 32).

It is true that "in rare circumstances" simply stating that a defendant was knowledgeable about a company's operations without any particularized allegations may demonstrate scienter, but only "where the nature of [a] relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *S. Ferry LP, No. 2*, 542 F.3d at 786 (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 (9th Cir. 2008)).

In *Berson*, for example, stop-work orders were alleged to have "halted tens of millions of dollars of [a] company's work." 526 F.3d at 988. Given the significance of the stop-work orders, the Ninth Circuit held that it would be absurd to suggest that the company's officers were unaware of the orders when they made misstatements indicating that the work was not halted. *Id.* In *Special Situations Fund III QP, L.P. v. Brar*, which Plaintiffs cite (Doc. 68 at 32), a government agency sent a letter to one of its contractors

warning that nearly all of its revenue was at risk if it did not adapt to meet government requirements. 2015 WL 1393539 at *1 (N.D. Cal. Mar. 26, 2015). The court there determined that the letter was of such significance that it would be absurd to suggest that the contracting company's officers were unaware of the threat to their revenue. *Id.* at *5. In the other case Plaintiffs cite (Doc. 68 at 32), *Roberti v. OSI Systems, Inc.*, a company hid the fact that it was struggling to develop certain technology pursuant to a government contract. 2015 WL 1985562 at *3 (C.D. Cal. Feb. 27, 2015). A government agency had sent a show cause letter to the company asking why it had not disclosed the difficulties and Congress had requested information from the company to see whether the company had attempted to defraud the government. *Id.* Given these facts, the court said it would be absurd for the company's officials to be unaware of the technology's development status. *Id.* at *13.

Plaintiffs draw a rule from this line of cases and argue "[w]here, as here, a particular aspect of a company's operations are of critical importance to the company as a whole, courts routinely draw an inference of knowledge on the part of the defendants [who are corporate officers]." (Doc. 68 at 32). Plaintiffs' stated rule is incomplete. All companies have operations of critical importance. The common thread between the cases, which Plaintiffs fail to include, is that the complaint detailed some event, a relevant fact, which had placed a critically important operation in jeopardy. *See S. Ferry LP, No. 2*, 542 F.3d at 786. In *Berson*, it was the stop-work order. In *Brar*, it was the warning letter. In *Roberti*, it was the show cause letter and the letter from Congress. Here, Plaintiffs argue that the relevant fact is that the COW extension negotiations were not going well and that Freeport's important mining operations might encounter difficulties. (Doc. 68 at 32). But this alleged fact does not reach the prominence of relevant facts in the other cases. *See S. Ferry LP, No. 2*, 542 F.3d at 786. *Berson's* stop-work orders would have halted millions of dollars in income immediately; Freeport, according to the FAC, has until 2021 to negotiate an extension. (Doc. 51at ¶ 2).

Ultimately the Court must ask, given that Defendants were knowledgeable of Freeport's investments in Indonesia and the nature of the COW, would it be absurd to

conclude anything but that Defendants intentionally or recklessly facilitated a bribery scheme carried out by a third person? *See S. Ferry LP, No. 2*, 542 F.3d at 785-86. This Court finds it is not absurd to conclude that Defendants' had no knowledge of the alleged bribery scandal based on their knowledge of Indonesian operations alone. This action is not one of those "rare circumstances" where the bare assertion that Defendants were involved in managing Freeport's Indonesian operations suffices demonstrate scienter. *See id.* at 786.

Finally, Plaintiffs try to draw the inference of scienter by describing "almost three decades of alleged FCPA violations on the part of Freeport." (Doc. 68 at 33). Although the events occurred before the class period (Doc. 51 at ¶¶ 31-44), Plaintiffs argue Defendants "continued that course of illicit conduct during the Class Period." (Doc. 68 at 33). In their Response, Defendants argue that "Plaintiff does not and cannot allege that Freeport has ever been charged with violating the FCPA; the claim is instead based on old reports containing recycled allegations that have never been substantiated or acted upon despite having been brought to the attention of the authorities years ago." (Doc. 60 at 17). Additionally, Defendants correctly assert that the confidential witnesses cited in the FAC do not profess to have knowledge that illegal activity occurred before the class period. (Doc. 60 at 18). Indeed, they only present their "opinion." (Doc. 51 at ¶ 36); *see also Zucco*, 552 F.3d at 995 ("[C]onfidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge.") Put simply, the FAC presents allegations of FCPA violations to support more allegations of FCPA violations. *See Iqbal*, 556 U.S. at 678 (stating that courts need not accept legal conclusions as true). A reasonable inference of scienter does not follow. *See Tellabs, Inc.*, 551 U.S. at 310.

Upon review of all the facts presented, the Court finds that there is no strong inference of scienter compelling enough to match the inference of nonfraudulent intent. *See id.* Therefore, the Court finds that the FAC fails to adequately plead scienter.

. . . .

. . . .

- 14 -

*3. Loss Causation*

Because the deficiencies with regard to Plaintiffs' allegations of material misrepresentation and scienter are clear, the FAC fails to state a claim for fraud. However, the Court will briefly discuss why the FAC also fails to demonstrate loss causation as further grounds for dismissal.

Pleadings under section 10(b) and Rule 10b–5 require that a plaintiff shows "some causal connection between the fraud and the securities transaction in question." *In re Daou*, 411 F.3d at 1025 (citing *Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1026 (9th Cir. 1999)). Loss causation is typically demonstrated with allegations that a defendant has admitted to a prior misstatement through a "corrective disclosure," which then causes the defendant company's stock price to drop. *Lloyd*, 811 F.3d at 1209 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2406 (2014)). In addition, "the announcement of an investigation can 'form the basis for a viable loss causation theory' if the complaint also alleges a subsequent corrective disclosure by the defendant." *Id.* at 1210 (quoting *Loos v. Immersion Corp.*, 762 F.3d 880, 890 n.3 (9th Cir. 2014)); *see also Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018). However, the announcement of an investigation into allegations of wrongdoing, standing alone, does not demonstrate loss causation because, "at the moment an investigation is announced, the market cannot possibly know what the investigation will ultimately reveal." *Loos*, 762 F.3d at 890.[4]

Defendants contend that the articles Plaintiff cited in the FAC only announced investigations, and that Freeport did not make a subsequent corrective disclosure. (Doc. 60 at 23, 25). The articles did not report that Defendants actually violated the FCPA or Indonesian law, or that Defendants' efforts to negotiate the COW extension had failed. (*Id.* at 23). Defendants argue that because Moffett's and Sjamsoeddin's resignations were not unusual or accompanied by any admission of wrongdoing, their resignations cannot

---

[4] The Court notes that Plaintiffs submitted a Notice of Supplemental Authority further elaborating Ninth Circuit law on loss causation. (Doc. 70). Defendants filed a Response (Doc. 71), and Plaintiffs filed a Reply. (Doc. 72). The briefings have been taken into consideration.

be construed as corrective disclosures to establish loss causation. (*Id.* at 25). Plaintiffs argue in their Response that the announcement of the Indonesian House of Representatives' investigation into the alleged bribery, coupled with Freeport's corrective disclosures, manifested by Defendant Moffett's and Sjamsoeddin's resignations, establish loss causation. (Doc. 68 at 35). In particular, Plaintiffs assert that their loss causation allegations meet the Ninth Circuit's "corrective disclosure" pleading requirement described in *Lloyd*. (*Id.*)

In *Lloyd*, a lending company had represented in SEC filings that it had no basis for "serious doubt" about its largest loan recipient's ability to repay. 811 F.3d at 1202. The company then disclosed that the SEC had subpoenaed financial records relating to its lending practices, after which the company's stock price fell twenty-two percent. *Id.* at 1204. A month later, the company announced that the loan recipient was unable to repay the loan as scheduled. *Id.* at 1205. Acknowledging that the announcement of an investigation is generally insufficient on its own to demonstrate loss causation, the *Lloyd* court nonetheless held that plaintiffs had demonstrated loss causation because, "the announcement of an SEC investigation related to an alleged misrepresentation, coupled with a subsequent revelation of the inaccuracy of that misrepresentation, can serve as a corrective disclosure for the purpose of loss causation." *Id.* at 1203.

This action and *Lloyd* are not analogous. First, Plaintiffs do not allege that any investigation into Freeport's activities ever resulted in a finding of wrongdoing. The FAC only pleads that the media reported on a government investigation, but "the announcement of an investigation, without more, is insufficient to establish loss causation." *Loos*, 762 F.3d at 890. The "more" that Plaintiffs posit, corrective disclosures manifested through resignations, cannot be compared to the corrective disclosure in *Lloyd,* where a company admitted to the inaccuracy of its prior statements. *See* 811 F.3d at 1203. As explained above, the resignations do not even establish an inference of wrongdoing.

For the same reasons, Plaintiffs' argument under a materialization of the risk approach also fails. (Doc. 68 at 34-36) ("The risks associated with this conduct ultimately

materialized when the public discovered that Freeport had been attempting to extort and bribe the GOI."). This approach, which the Ninth Circuit has not adopted, "recognizes loss causation where a plaintiff shows that 'misstatements and omissions concealed the price-volatility risk (or some other risk) that materialized and played some part in diminishing the market value' of a security." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1120 (9th Cir. 2013) (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 176–77 (2d Cir. 2005)). Plaintiff has not shown that any statement Defendants made was indeed a misstatement or an omission concealing a price-volatility risk. Again, Plaintiffs cannot use the resignations as evidence that Defendants misstated or failed to state anything, and the news reports only reveal that an investigation had begun. "Consequently, any decline in a corporation's share price following the announcement of an investigation can only be attributed to market speculation about whether fraud has occurred. This type of speculation cannot form the basis of a viable loss causation theory." *Loos*, 762 F.3d at 890. Therefore, the FAC fails to establish loss causation.

The Court finds that the FAC fails to adequately plead violation of section 10(b) and Rule 10-b5 in its First Count. (Doc. 51 at ¶¶ 215-19). It shall be dismissed. The FAC's Second Count, violation of section 20(a), is contingent upon the first and so must also be dismissed. (*Id.* at ¶¶ 220-23); *see* 15 U.S.C. § 78t(a); *Zucco*, 552 F.3d at 990 (stating that section 20(a) claims may be dismissed if a plaintiff fails to plead a primary violation of section 10(b)).

### III. Leave to Amend

In a footnote, Plaintiffs requested leave to amend should the FAC be found insufficient. (Doc. 68 at 37 n.5). "[A] a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)). After reviewing the 87-page FAC, in which Plaintiffs try and fail to make a claim, it is not clear to the Court how further amendments could cure the deficiencies described

above. If Plaintiffs still wish to file a second amended complaint, they must first file a motion to amend explaining how they can possibly cure the FAC's deficiencies.

Accordingly,

**IT IS ORDERED** that Defendants' Motion to Dismiss (Doc. 60) is **granted**.

**IT IS FURTHER ORDERED** that Plaintiffs' First Amended Complaint (Doc. 51) is **dismissed** with leave to file a motion to amend within **thirty (30) days** of the date this Order is entered.

**IT IS FINALLY ORDERED** that if Plaintiffs do not file a motion to amend within **thirty (30) days** of the date this Order is entered, the Clerk of Court shall dismiss this action without further order of this Court.

**Dated** this 2nd day of August, 2018.

_____
Honorable Diane J. Humetewa
United States District Judge